IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*FILED*

MAY 1 8 2005

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                 Civil No. 1:04CV41

M-K SPECIALTIES MODEL M-14
MACHINEGUN SERIAL NUMBER
1447797, ET. AL.,

       Defendants.

## GOVERNMENT'S MOTION
## FOR SUMMARY JUDGMENT

    The United States urges  this Court to enter an order of summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  In support of this motion, the government avers that there is no genuine issue as to any material fact and the United States is entitled to judgment as a matter of law.

                            Respectfully submitted,

                            THOMAS E. JOHNSTON
                            UNITED STATES ATTORNEY

By:                                      
                            Michael D. Stein
                            Chief, Asset Forfeiture and
                                    Money Laundering Section

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Civil No. 1:04CV41

M-K SPECIALTIES MODEL M-14
MACHINEGUN SERIAL NUMBER
1447797, ET. AL.,

        Defendants.

MEMORANDUM IN SUPPORT OF
GOVERNMENT'S MOTION
FOR SUMMARY JUDGMENT

The only issue remaining in this case after the pleadings and discovery are considered is

the legal question of whether the defendant receivers are machineguns within the meaning of 26

U.S.C. § 5845(b).[1] Because there is no genuine factual dispute regarding that issue, the United

States is entitled to a summary judgment. Rule 56(c), F.R.Civ.P.[2]

---

[1] It is undisputed that all of the defendant receivers were remanufactured in this district by claimant Michael J. Kelly, Sr., ("Kelly"), doing business as M-K Specialties, from halves of M-14 military machineguns that Kelly welded together into M-K Specialties receivers. It is also undisputed that Kelly maintained an inventory of receivers that included the defendants identified in paragraph 8 of the forfeiture complaint, and was engaged in the business as a dealer in firearms through which he sold and transferred defendant receivers to out of state customers as alleged in paragraph 7. It is further undisputed that Kelly neither paid the special (occupational) tax required by 26 U.S.C. § 5801 nor registered with the Secretary of the Treasury under 26 U.S.C. § 5802. It is similarly undisputed that no claimant or anyone else registered any defendant receiver in the National Firearms Registration and Transfer Record maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives.

[2] Claimants cannot be heard to argue that the acquittal of Michael J. Kelly, Sr. defeats the government's right to summary judgment. Kelly's acquittal does not effect the government's right to forfeiture "because the burdens of proof in the two proceedings differ dramatically." *One Blue 1977 AMC Jeep CJ-5, VIN J783EA076436 v. U.S.,* 783 F.2d 759, 762 (8th Cir. 1986)(claimant's "acquittal does not raise a genuine issue of material fact as to" forfeiture), *U.S. v. 1988 Oldsmobile Cutlass Supreme 2 Door, VIN 1G3WR14W5JD323281,* 983 F.2d 670, 675 (5th Cir.

Section 5845(b)'s definition of the term "machinegun" includes any weapon or receiver that can be "readily restored" to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. *Id.*[3] The term "restored" refers to any firearm that was once capable of firing automatically, such as a M-14 military machine gun that has been modified to prevent automatic firing, which can be remodified to again fire automatically.[4] See,

---

1993) (The "acquittal of the claimant on the underlying criminal charges does not mean that the government failed, *ipso facto*, to meet the more lenient" standard of proof in the forfeiture action.) In the criminal case, United States had the heavy burden of proving all elements of the crime charged beyond a reasonable doubt. In this forfeiture action, the burden of proof is the lesser preponderance standard. (The two opinions relied upon above were decided before the enactment of CAFRA when the forfeiture burden was probable cause. Since the current preponderance standard is dramatically less than the heavy beyond a reasonable doubt standard, the distinction between the probable cause and preponderance standards is not significant, and, therefore, the cited cases are directly on point.) Further, the evidence presented in this forfeiture action is significantly more than the evidence presented to the jury. During the criminal trial, ATF technician Vasquez was confronted with a withering cross examination related to his failure to make accurate, contemporaneous records documenting the conversion process. In this forfeiture proceeding, the entire conversion process was videotaped during Vasquez's deposition.

[3] Section 5845(b) also includes within the definition of a "machinegun" any firearm or receiver that is "designed" to shoot automatically. At least four courts have held that M-K Specialties welded M-14 receivers are machineguns within the definition of the National Firearms Act because they are "designed" to shoot automatically. *U.S. v. One TRW, Model M14, 7.62 Caliber Rifle,* 294 F.Supp.2d 896, 901-902 (E.D.Ky. 2003); *U.S. v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, Serial Number 85279,* 278 F.Supp.2d 888, 891-892 (W.D.Mich. 2003); *U.S. v. One (1) MKS/Winchester Model M14 Machinegun Receiver, Serial No. 204143, One (1) MKS/TRW Model M14 Machinegun Receiver, Serial No. 593006 (D. Az. 2004),* (unpublished) (Appendix 2, p. 9); and *U.S. v. One (1) TRW U.S. Rifle Model 14 7.62x51 mm caliber, Serial No. 1393707* (C.D. Ill. 2003) (unpublished) (Appendix 3, p. 5). Those cases involved an MKS receivers. Accordingly, the "designed to shoot" automatically definition is an independent basis for summary judgment.

[4] Conversely, the term "readily"excludes "time consuming and impractical" procedures. *U.S. v. Seven Miscellaneous Firearms,* 503 F.Supp. 565, 573 (D. D.C., 1980) ("The experts agreed that if this procedure were elected, a shop in which the tools would cost approximately $65,000 would be required and expert gunsmith services would be necessary.") Similarly, the term "readily restorable" excludes anything that was "never in the first place designed to shoot." *Id.* at 574. As shown, these cases are inapposite because the defendant receivers can be converted to fire automatically without expensive tools, and were originally designed to fire automatically.

*U.S. v. Aguilar-Espinosa,* 57 F.Supp.2d 1359, 1362 (M.D. Fla.,1999) ("The intent of the 'ready restoration' clause is, at least, to statutorily include a weapon that is inoperable as a fully automatic weapon on the occasion of the alleged unlawful possession but is capable of renewed automatic operation by the purposeful deployment of a practicable effort.")[5]

During his videotaped deposition[6], ATF technician Richard Vasquez converted a typical M-K Specialties model M-14A receiver [7] to fire automatically in under 50 minutes.[8] He did it

_____

[5] This common sense definition of "readily restorable" has historically been utilized by the Bureau of Alcohol, Tobacco, Firearms and Explosive *E.g.,* ATF Rul 83-5. Appendix 4.

[6] Pursuant to LR Civ P. 5.01, the original video tape and complete stenographic transcript of the deposition will be filed only upon the Court's order. Appended to this memorandum (in Appendix 1) are condensed pages from the stenographic transcript of the Vasquez deposition.

[7] At the beginning of the deposition, Claimant Kelly stipulated that the receiver that Vasquez was about to modify was representational of the condition of MKS receivers as they were completed at the factory. (Appendix 1 p. 7.)

[8] This excludes clean up time and other periods ancillary to the conversion, but not actually part of the process. At the outset, Vasquez wasted about four minutes trying to use a drill press that slipped off of the mark. Appendix 1 pp. 19-20. Next, he drilled a hole in selector tab **with a hand held drill**. Appendix 1 pp. 20-24. That took 40 minutes, and completed the first phase of the restoration procedure. Appendix 1 pp 20-24, 27. Vasquez then cleaned and re-assembled the receiver for a test firing. Appendix 1 pp. 24, 27-28. The re-assembly included the addition of a selector and connector assembly to enable the receiver to fire automatically. Those parts cost approximately $79. Appendix 1 p. 31. The first of two test fires failed because Vasquez had merely "eyeball[ed]" the point where the selector should be drilled, and was off center by about 1/16[th] of an inch. Appendix 1 p. 48. To remedy his error, Vasquez added a drop of weld to extend the sear release. Appendix 1 pp. 33-35. The welding procedure took just a few minutes. Appendix 1 pp. 39-40, 51. Vasquez used a Tig welder because it was the only welding equipment available at the ATF lab. Otherwise, Vasquez could have added the weld with a variety of inexpensive readily available equipment. Appendix 1 pp. 50-51. Had Vasquez accurately measured the placement of the hole, the addition of weld would not have been necessary. Appendix 1 p. 48. The second test fire was a complete success. Vasquez fired a three round burst with the receiver set on automatic; fired another three rounds with the receiver in the semiautomatic mode; and then at the request of claimants' counsel, fired an additional five round automatic burst. Appendix 1 pp. 41-42.

primarily with a hand drill, an inexpensive carbide burr,[9] and a welding machine.[10]

The courts have uniformly held that the "readily restorable" test is satisfied under far less compelling facts. *E.g., U.S. v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (firearm was "readily" restorable to shoot automatically notwithstanding that the restoration took "about an 8-hour working day in a properly equipped machine shop"); *U.S. v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, Serial Number 85279*, 278 F.Supp.2d 888, 891 (W.D. Mich. 2003 aff'd, 378 F.3d 533 (6th Cir. 2004) (firearm "satisfies the 'readily restorable' test if it can be made capable of automatic operation through some form of restoration, including restoration requiring a degree of skill and the use of tools and parts");[11] *U.S. v. Catanzaro*, 368 F. Supp. 450, 453 (D. Conn. 1973) (firearm restored to automatic fire capability in about an hour with additional parts costing less than $15).

Accordingly, because the undisputed evidence proves that the defendant receivers are machineguns within the meaning of 26 U.S.C., § 5845(b), the United States is entitled to summary judgment.

Respectfully submitted,

THOMAS E. JOHNSTON
UNITED STATES ATTORNEY

By: *Michael D. Stein*

Michael D. Stein
Chief, Asset Forfeiture and
    Money Laundering Section

---

[9] Carbide burrs are commonly available in hardware stores for between $7 and $15. Appendix 1 pp. 14-15. The carbide burr used by Vasquez was purchased at Lowes. Appendix 1 pp. 29-30.

[10] See Appendix 1 pp. 17-19 for a full description of the tools used during the conversion.

[11] *United States v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, Serial Number 85279*, 278 F.Supp.2d 888 (W.D. Mich. 2003 *aff'd* by 378 F.3d 533 (6th Cir. 2004) involved an MKS M-14 receiver of the same type and configuration as the defendants in this case.

# APPENDIX 1

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

- - - -

UNITED STATES OF AMERICA,          :

     Plaintiff,          :

V.                                  : Civil No.

M-K SPECIALTIES MODEL M-14   : 1:04CV41

MACHINE GUN SERIAL NUMBER    :

1447797, et al.,             :

     Defendants.          :


Pursuant to Notice, the video deposition of RICHARD VASQUEZ was taken on Tuesday, the 19th day of October, 2004, commencing at 5:08 p.m., at the offices of the Bureau of Alcohol, Tobacco Firearms and Explosives, located at 244 Needy Road, Martinsburg, West Virginia, before Brian M. McDonald, a Notary Public

**2**

A P P E A R A N C E S

FOR THE PLAINTIFF:

  MICHAEL D. STEIN, ESQUIRE

  U.S. Department of Justice

  United States Attorney's Office

  Northern District of West Virginia

  P.O. Box 591

  1125 Chapline Street, Suite 3000

  Wheeling, West Virginia 26003

FOR THE DEFENDANTS:

  RICHARD E. GARDINER, ESQUIRE

  Suite 404

  10560 Main Street

  Fairfax, Virginia 22030

DIVISION COUNSEL FOR BUREAU OF ALCOHOL

TOBACCO, FIREARMS AND EXPLOSIVES:

  MARK J. LOWNEY, ESQUIRE

  Department of Justice, Bureau of ATFE

  800 Dr. Martin Luther King, Jr., Place

  Suite 354

  Louisville, Kentucky 45202

**3**

ALSO PRESENT:

  MR. TIM WRIGHT, Videographer

  MR. MICHAEL J. KELLY, SR.

  MR. GREG PERRY

**4**

I N D E X

WITNESS:  MR. RICHARD VASQUEZ          Page

  Direct Examination by Mr. Stein...... 6

  Cross-Examination by Mr. Gardiner.... 43

  Redirect Examination by Mr. Stein.... 45

  Recross-Examination by Mr. Gardiner.. 46

  Redirect Examination by Mr. Stein.... 50

5

1    MARTINSBURG, WEST VIRGINIA
2    TUESDAY, OCTOBER 19, 2004
3              - - -
4         P R O C E E D I N G S
5    Whereupon,
6         THE VIDEOGRAPHER:  I'm Tim Wright
7    representing Tri-State Reporters, Inc.  The
8    date is Tuesday, October the 19th, 2004.  The
9    time is 5:08 p.m.
10        This deposition is of...
11        MR. VASQUEZ:  Rick Vasquez.
12        THE VIDEOGRAPHER:  ...Rick
13   Vasquez.
14        It is in the ATF office in
15   Martinsburg, West Virginia, at 244 Needy Road.
16        MR. VASQUEZ:  Correct.
17        THE VIDEOGRAPHER:  This case is in
18   the United States District Court for the
19   Northern District of West Virginia.
20        It is United States of America,
21   Plaintiffs, vs. M-K Specialties Model M14

6

1    Machine Gun Serial Number 1447797, et al., the
2    Defendants.
3         At this time I would ask the
4    attorneys in the room to please identify
5    themselves and who they represent.
6         MR. STEIN:  Michael Stein
7    representing the United States.
8         MR. GARDINER:  And Richard
9    Gardiner representing the Claimant.
10        THE VIDEOGRAPHER:  And others in
11   the room please identify yourselves.
12        MR. PERRY:  Greg Perry, Bureau of
13   Alcohol, Tobacco and Firearms.
14        MR. LOWNEY:  Mark Lowney, Division
15   Counsel for the Louisville Field Division of
16   ATF.
17        THE VIDEOGRAPHER:  Sir.
18        MR. KELLY:  Michael Kelly, Sr.,
19   the manufacturer.
20        THE VIDEOGRAPHER:  Okay.  Thank
21   you.

7

1         At this time please swear in the
2    witness.
3         (Whereupon, the witness
4         was administered the oath
5         by the reporter)
6         MR. STEIN:  Mr. Gardiner, are you
7    representing only Mr. Kelly or other claimants
8    as well during this deposition?
9         MR. GARDINER:  I'm representing
10   other claimants as well.
11        MR. STEIN:  At the outset, we have
12   reached a stipulation before this deposition
13   has started that I am going to announce, and
14   that is that M-K Specialties Model M-14A Serial
15   Number 1392697 is in a condition now that is
16   representational of the condition of MKS-14A
17   receivers as they are completed at the factory.
18        MR. GARDINER:  So stipulated.
19
20
21

8

1    Whereupon,
2              RICHARD VASQUEZ,
3    having been previously duly sworn, was examined
4    and testified upon his oath as follows:
5              DIRECT EXAMINATION
6    BY MR. STEIN:
7         Q.   Mr. Vasquez, by whom are you
8    employed?
9         A.   The Bureau of Alcohol, Tobacco
10   and Firearms, Firearms Technology Branch.
11        Q.   And what is your present
12   position?
13        A.   My present position is -- my job
14   skill is I'm a firearms enforcement officer and
15   my position is Assistant Branch Chief of the
16   Firearms Technology Branch.
17        Q.   And how long have you been
18   working in the capacity of a firearms branch
19   technician?
20        A.   I've been a firearms enforcement
21   officer for a few months over five years.

13

1    Q.   Have you personally restored an
2 MKS 14A receiver to fire automatically?
3    A.   Yes, I have.
4    Q.  How long did it take you to do
5 it?
6    A.   Approximately forty-five
7 minutes.
8    Q.   With general terms could you
9 describe the process that you followed to
10 restore an MKS 14A receiver to fire
11 automatically?
12    A.   In general terms in an attempt
13 to replicate the exact way that I did it, I
14 first took an M-14 and drilled out the selector
15 shaft that had been welded in place, and then I
16 cut off the remaining of the sear release with
17 a Dremmell tool and a cutoff wheel. And after
18 these parts were removed, I assembled the
19 firearm and shot it.
20    Q.   And as part of that process, did
21 you say that you actually drilled a hole?

14

1    A.   Yes, I did.
2    Q.   Now, had you attempted to drill
3 the hole and for whatever reason you were
4 unable to do it, could you have still readily
5 restored that receiver?
6    A.   Unable to do it in the manner
7 that it was too hard or...
8    Q.   Yes.
9    A.   Yes. I could have.
10    Q.   How would you do it then?
11    A.   I would have used a carbide burr
12 and just ground out the center of the shaft and
13 using a carbide burr inside the Dremmell tool.
14    Q.   As a carbide -- what...
15    A.   Carbide burr or carbide bit.
16    Q.   Well, is a carbide bit readily
17 obtainable in a hardware store like Sears or
18 Home Depot?
19    A.   Yes, they are.
20    Q.   And about how much do they cost?
21    A.   They range from seven to fifteen

15

1 dollars.
2    Q.   Now, the MKS M-14A that you
3 restored, during the process of your
4 restoration of this, did you have to add some
5 weld?
6    A.   No, I did not.
7    Q.   Do you foresee a possibility
8 that on some of the MKS-14 Model 14A's that you
9 might have to use a little weld?
10    A.   Yes. There's different
11 variations in the amount of weld that is on the
12 selector studs. Some have a lot of weld. Some
13 have actually milled square, and those, the
14 ones that are milled square, would have to have
15 material added by weld to have sufficient
16 amount to drill through it.
17    Q.   If you had to add weld, could
18 you do it on a welding machine that is commonly
19 available to a typical hobbyist in his garage
20 workshop?
21    A.   Yes, you could.

16

1    Q.   And if you were going to do it
2 here, would you use that kind of welding
3 machine?
4    A.   I would use a Tig welder that we
5 have.
6    Q.   And that's because it's here?
7    A.   Because it's here and I'm very
8 comfortable with it.
9    Q.   About how much time would you
10 save by using a Tig welder over a more
11 commercially available welder?
12    A.   Well, a Tig welder has less
13 excess metal to clean up after you weld. So
14 you know it could be a matter of five minutes,
15 or it would be a matter of fifteen minutes.
16    Q.   As you heard at the beginning of
17 this deposition, Mr. Kelly for himself and
18 Mr. Gardiner on behalf of other claimants,
19 stipulated that MKS Model Serial No. 1392697 is
20 representational of the receivers that M-K
21 Specialties manufactured.

17

1    Have you looked at Serial No. 1392697?

2    A.    Yes, I did.

3    Q.    And is it pretty much in the

4 same condition as the other defendants -- well,

5 I'm sorry, when I said other defendants, as the

6 defendants?

7    A.    Yes, it is.

8    Q.    And so you agree that it's

9 representational of the M-K Specialties M-14A

10 receivers that you looked at?

11    A.    Yes, I do.

12    Q.    And do you believe that you can

13 restore that receiver to fire automatically?

14    A.    Yes, I do.

15    Q.    And can you do it with tools

16 that are commonly available in a home workshop?

17    A.    Yes, you can.

18    Q.    And actually, you have these

19 tools available that you can point out and

20 indicate which tools you will be using to

21 actually restore the receiver?

18

1    A.    What I intend to use to restore

2 the receiver, we have a drill press that's

3 located in a room adjacent to this room, and

4 we'll see it when we move to that room.  And

5 that will be the drill press that holds the

6 drill bit to drill through the shaft.

7    And then I plan on using a -- we use

8 the term Dremmell tool.  This one was

9 manufactured by Craftsman.  But it's always

10 retained the nickname of Dremmell because it

11 was first manufactured by Dremmell.

12    Then punches, hammer, screwdriver, a

13 drill bit and possibility of using carbide

14 burrs and also a cutoff wheel, which is

15 attached already to the Dremmell tool.

16    Q.    And using those tools, is it

17 your opinion after having looked at the

18 remaining defendant receivers, that you could

19 restore them in about the same amount of time

20 that you would be able to restore Serial No.

21 1392697?

19

1    A.    Yes.  In approximately the same

2 amount of time.

3    Q.    Are you ready to begin the

4 process now?

5    A.    Yes, I am.

6    Q.    Would you do that and describe

7 what you are doing as you do it?

8    A.    Yes.  The first thing I'm going

9 to do is we're going to go into the adjacent

10 room, and I'm going to drill out the selector

11 shaft.  And we'll do that now.  Do you want to

12 take the camera.

13    THE VIDEOGRAPHER:  The time

14 is 5:20 p.m.  We're now off the record.

15    (Whereupon, the parties moved to an

16    adjacent room)

17    THE VIDEOGRAPHER:  The time

18 is 5:28 p.m.  We are now back on the record.

19    THE WITNESS:  What I'm going

20 to do now is I've put the rifle into the vice.

21 It took probably about two minutes and I

20

1 clamped it softly in place here.

2    I'm going to eyeball the

3 drill bit into the center of the shaft.  And

4 not using the center punch, I'm just going to

5 eyeball it and drill it once I get it lined up.

6    This shaft was cut at an

7 angle, so the drill bit keeps floating.  So

8 what I'm going to do is I'm going to do it

9 manually with a carbide burr.  Because as you

10 can see, the drill bit's bending as it comes

11 over.

12    So we'll just head back into

13 the other room.

14    THE VIDEOGRAPHER:  The time

15 is 5:30 p.m.  We are back off the record.

16    (Whereupon, the parties moved to the

17    adjacent room)

18    THE VIDEOGRAPHER:  The time

19 is 5:35 p.m.  We are back on the record.

20    THE WITNESS:  All right.  As

21 I said earlier, the drill was sliding on the

21

1 selector stud.  So I'm going to come in here
2 and manually cut it out using a carbide burr.
3 I'm just going to put it in the vice for
4 support.
5         You want to make sure that
6 you don't get too close because the metal
7 filings could get in your eyes, and that's why
8 I've got the lights kind of protecting me.
9         What I'm going to do now,
10 since I'm cutting with the Dremmell tool, I'm
11 going to cut off the portion of the sphere,
12 release it from the other side, and that way I
13 can come through on the other side and have the
14 two portions of holes meet in the center.
15         Now, these have a tendency to
16 break so once again, you don't want to look too
17 close in case it does break.
18         You don't want to look too
19 close in case it does break.  You can look at
20 it before I continue.  You can go ahead and
21 look at it.

22

1 BY MR. STEIN:
2         Q.   Are you ready to go onto the
3 next process?
4         A.   What I'm going to continue doing
5 now is continue cutting out the selector shaft.
6 And I clear it so I can see on this side.
7         I've cut off the portion of sear
8 release.  And I may have to cut off more sear
9 release, but right now I'm going to move on to
10 cutting out the selector shaft.
11         I'm sorry.  This is the bad part when
12 the hole goes through, the bit breaks when it
13 traps itself in there.  Hopefully, I won't
14 break my bit.
15         I'm going to switch bits real quick so
16 I don't break this one.  I switched to a
17 conical type bit.
18         I'm going back to the straight bit.
19 I'm getting real close.  I just want to make
20 sure I don't cut the hole too big.
21         I have cut a hole completely through

23

1 the shaft.  Now I have got to clean it up so
2 the sear release will go over.
3         THE VIDEOGRAPHER:  Okay.
4 Hold on one second.  Are you going to drill
5 more?
6         THE WITNESS:  No.  I'm going
7 to start cutting with the slitting disk again.
8 Did you need to stop?
9         THE VIDEOGRAPHER:  Just for a
10 second.
11         The time is 6:05 p.m.  We're
12 off the record.
13         (Whereupon, a recess was taken)
14         THE VIDEOGRAPHER:  The time
15 is 6:06 p.m.  We're on the record.
16         THE WITNESS:  Okay.  I'm
17 changing a slitting disk now.  It cuts more of
18 the sear release off.
19 BY MR. STEIN:
20         Q.   What are you doing now?
21         A.   Just checking my fit on the sear

24

1 release.  I have a little bit more weld to
2 remove.
3         Q.   What did you put on the tool?
4         A.   Another slitting disk.  I'm
5 sliding the fire mechanism in to see.
6         I'm going to go ahead and assemble it
7 now, clean it off real quick.  There is a
8 cleaning tank right in here.  If I can just
9 step around you, I'm just going to clean it off
10 with cleaning solvent.
11         THE VIDEOGRAPHER:  Okay.  The
12 time is 6:16 p.m.  We're off the record.
13         (Whereupon, the parties moved to
14         another room)
15         THE VIDEOGRAPHER:  The time
16 is 6:19 p.m.  We're back on the record.
17         THE WITNESS:  All right.  I'm
18 going to clean out all the residue from the
19 slitting disk.
20         First of all, I'm going to
21 take off this evidence tag.  If you or Greg

25

1 want to hold the mic.  I didn't think about
2 taking this off earlier.
3         MR. STEIN:  Let's go off the
4 record and start it again when he's got the tag
5 off.
6         Just start it again.
7         THE VIDEOGRAPHER:  Okay.  The
8 time is 6:19 p.m.  We're off the record.
9         (Whereupon, a brief recess was taken)
10         THE VIDEOGRAPHER:  The time
11 is 6:20 p.m.  We're back on the record.
12         THE WITNESS:  What I'm going
13 to do is just use a general cleaning compound,
14 cleaner solvent and get all the particles that
15 came from the slitting disk and the grinding
16 before we assemble the firearm.
17         Stop now.
18         THE VIDEOGRAPHER:  The time
19 is 6:20 p.m.  We're back off the record.
20         (Whereupon, the parties moved to
21         the other room)

26

1         THE VIDEOGRAPHER:  The time
2 is 6:21 p.m.  We're back on the record.
3         THE WITNESS:  All right.  I'm
4 going to just dry off and do the assembly of
5 it.
6         The first portion I'm going
7 to assemble is the sear release and selector
8 shaft.  You might want to stop it while...
9         THE VIDEOGRAPHER:  The time
10 is 6:23 p.m.  We're back off the record.
11         (Whereupon, a brief recess was taken)
12         THE VIDEOGRAPHER:  6:23 p.m.
13 Back on the record.
14         THE WITNESS:  Putting the
15 magazine catch in.
16         THE VIDEOGRAPHER:  Can you
17 move this mirror?
18         THE WITNESS:  The mirror or
19 the light?
20         THE VIDEOGRAPHER:  Thank you.
21 Or yeah, light.

27

1 BY MR. STEIN:
2         Q.   Have you completed the process
3 with respect to the receiver at this point?
4         A.   Yes.  The receiver portion has
5 been completed.
6         MR. STEIN:  Would you note
7 the time, please.
8         THE VIDEOGRAPHER:  The time
9 is 6:25 p.m.
10 BY MR. STEIN:
11         Q.   About how long ago did you
12 complete the receiver part?
13         A.   Before I cleaned it.
14         Q.   All right.  So the cleaning was
15 not part of the restoration process, is what
16 you're saying?
17         A.   I had completed the hole for the
18 selector shaft prior to cleaning the residue
19 off.
20         Q.   And what are you doing?
21         A.   Now I'm assembling.  I put the

28

1 -- this is the connector lock pin.  Let me get
2 my fat fingers in there.
3         Now, the bolt -- now, generally if I
4 was going to do a firearm for an individual, I
5 would set the head space.
6         But this has a military-type barrel
7 that has a fairly large head space.  And so I'm
8 just going to stick a bolt in there without
9 checking the head space on it.  This is the
10 operating rod, spring and guide.  And the
11 connector.  And stock.
12         On the other one that I restored, I
13 didn't put the flash pressure on.  It's not
14 integral to make it shoot.
15         THE REPORTER:  It's not what?
16         THE WITNESS:  Integral to
17 make it fire.  The one that I test fired under
18 video did not have a flash suppressor on it.
19 See if it shoots.
20 BY MR. STEIN:
21         Q.   Well, before that, during the

29

1 process I noticed that you used a conical type
2 bit and also a sledding disk. Is that...
3      A.   Slitting.
4      Q.   Slitting disk.
5      A.   Cuts slits.
6      Q.   Are those both commonly
7 available in hardware stores?
8      A.   Yes, they are.
9      Q.   And do you know approximately
10 what they cost?
11      A.   The slitting disk, you buy them
12 in a little box. I would just have to guess at
13 five dollars for a little tube of probably
14 twenty of them. And that's just a wild guess.
15 It could be two dollars. The conical bit,
16 that's a carbide bit, once again, seven to
17 fifteen dollars.
18      Q.   And is that carbide bit
19 available locally?
20      A.   Yes, it is.
21      Q.   Was it, in fact, bought from a

30

1 local hardware store?
2      A.   Yes. It was bought from the
3 local Lowe's.
4      Q.   At some point in the process you
5 used what looks like a hammer or other tools.
6 Are those all commonly available in a hardware
7 store?
8      A.   Yes. As a matter of fact, if
9 you look around, we had an influx of money
10 towards the end of the year and went to Sears
11 and we were able to purchase all these tools
12 that you see in boxes and punches and hammers
13 and everything we purchased at the local Sears.
14      Q.   So anything that you used tool-
15 wise is something that an ordinary hobbyist
16 would not have in his tool room?
17      A.   What I used on here, you know,
18 the M-14 cleaning handle, it's a combination
19 tool. If I bought an M-1A or an M-14, most
20 likely get in a cleaning kit that is stuck into
21 the butt of the stock.

31

1      Q.   And as far as the tools are
2 concerned, are all the tools commonly available
3 for hobbyists?
4      A.   Yes, they are.
5      Q.   And did you also install some
6 parts to make it now fully automatic?
7      A.   I installed the selector shaft,
8 the selector and the connector assembly, which
9 when we were doing a research on availability
10 of parts, the first web site that we went to
11 was Armscore, and I believe -- I am not exactly
12 sure -- I think a set of parts was seventy-nine
13 dollars.
14      That's the minor parts, not the
15 operating rod or the gas system, but these
16 parts right here, the small parts.
17      Q.   So that all of the parts that
18 you used in the conversion are readily
19 available in a lawful purchase?
20      A.   Yes.  They are.
21      Q.   All right.  Let's move to the

32

1 range.
2      A.   Let me make sure first that
3 everybody has a - I have enough sound
4 suppression back there.
5      So at this time if you guys want to
6 run to the bathroom, because I've got to make
7 sure we collect enough sets of ear plugs.
8      THE VIDEOGRAPHER:  The time
9 is 6:32 p.m.  We are off the record.
10      (Whereupon, a recess was held)
11      (Whereupon, the following
12      proceedings occurred in
13      the shooting range)
14      THE VIDEOGRAPHER:  The time
15 is 6:41 p.m.  We're back on the record.
16      THE WITNESS:  I have a
17 magazine with three rounds of 7.62 ammunition.
18 I'm going to first shoot the firearm on
19 semiautomatic.  Everybody have their eyes and
20 ears on?
21      Three more rounds.  Putting

**33**

the selector on to A-position, automatic
selector, the automatic position.

THE VIDEOGRAPHER: The time
is 6:49 p.m. We're back on the record.

THE WITNESS: When I shot the
firearm in the automatic position, it didn't
shoot automatically. So I'm going to
disassemble the gun and do a troubleshoot on it
and see why the sear wasn't disengaging.

What it appears like is
because of the selector stud was narrowed when
I trimmed it up, that the sear is not going far
enough over from -- excuse me -- the sear
release is not going far enough over to engage
the sear.

The first thing I'm going to
do is try a different stock. And I have
another stock right out here.

I'm going to grab the other
stock and see if that will give it a different
distance between the firing mechanism and the

**34**

receiver. Okay? Stop and take about two
minutes to go get the stock.

THE VIDEOGRAPHER: The time
is 6:52 p.m. We're off the record.

(Whereupon, a recess was taken)

(Whereupon, the following
proceedings were held in
the original deposition site)

THE VIDEOGRAPHER: The time
is 6:53 p.m. We're back on the record.

THE WITNESS: I'm going to
put the firing mechanism in and with no stock.
And that's exactly what's happened.

You can see that the sear
release is not coming back sufficiently to trip
the sear. When the bolt hits the connector, it
pulls the sear release to the rear and it's
engaging the sear and not sufficient.

Okay. Now, to correct this,
you just add a small portion of metal weld to
that area and build it up, and then that will

**35**

give me contact. Okay.
BY MR. STEIN:

Q. You're going to do that now?

A. Do it now. I only have -- I
don't know how you're going to video tape this.
You're going to have to turn your head.

THE VIDEOGRAPHER: Okay.
Hold on.

THE WITNESS: Go ahead and
stop.

THE VIDEOGRAPHER: The time
is 6:55 p.m. We're off the record.

(Whereupon, a discussion
was held off the record)

THE VIDEOGRAPHER: The time
is 6:56 p.m. We're back on the record.

THE WITNESS: Okay. I'm
going to grab the welding helmets and a piece
of rod.

MR. GARDINER: Michael, can
we put on the record what kind of machine this

**36**

is?
BY MR. STEIN:

Q. Yes. Is this what you referred
to as a Tig welder...

A. Yes.

Q. ...in the earlier portion of the
deposition?

A. It's a Miller Syncrowave welder.
It's capable of Tig and stick welding.

Q. What will you be doing, Tig or
stick welding?

A. I'm going to be doing Tig
welding. I'm making sure that I have gas flow.
I'm not going to do anything until I tell you
guys.

THE VIDEOGRAPHER: Okay.
Where do I set up? Right here.

THE WITNESS: All right. If
you want to come over here, I don't know how
bright can that camera take?

THE VIDEOGRAPHER: It will be

37

1 fine.
2          THE WITNESS:  It will be
3 fine?
4          THE VIDEOGRAPHER:  Yes.
5          The time is 6:59 p.m.
6          We're off the record.
7          (Whereupon, a brief recess was taken)
8          THE VIDEOGRAPHER:  The time
9 is 7:00 p.m.  We're now back on the record.
10          THE WITNESS:  Okay.  You
11 ready?  Keep your hood down.  I think I lost
12 the tension on the spring.
13          THE REPORTER:  You're on the
14 record.
15          THE WITNESS:  Yes, I'm still
16 on the record.  Okay.  Go ahead and -- helmet
17 back on.
18          THE VIDEOGRAPHER:  Yeah.
19          THE WITNESS:  You can call
20 them in and then...
21          THE VIDEOGRAPHER:  The time

38

1 is 7:02 p.m.  We're off the record.
2          (Whereupon, a brief recess was taken)
3          THE VIDEOGRAPHER:  The time
4 is 7:03 p.m.  We're back on the record.
5          THE WITNESS:  Okay.  I'm
6 going to check and see if that is sufficient
7 metal added to trip it.  And that's sufficient
8 weld.  It is sufficient weld.  It is now
9 tripping it.  And I tried it a while ago with
10 it on semi-automatic and you saw that it was
11 not tripping it.
12          Now, it's on A and it is
13 tripping it.  And if that spring is sufficient,
14 I'm not going to change the spring.
15          I would rather just shoot it
16 with the spring in case it lost the spring
17 tension.  It doesn't seem to have enough.
18          But I'll shoot it first with
19 the damaged spring that's in it, and then
20 change the spring if I have to.  Okay.
21          THE VIDEOGRAPHER:  Was there

39

1 something you wanted on the record first?
2          MR. GARDINER:  Well, if he's
3 going to do anything more here, we'll just stay
4 on the record.
5          THE WITNESS:  I was just
6 getting ready -- I'm going to just let it cool
7 and go ahead and stop, let it pull for a few
8 minutes.
9          THE VIDEOGRAPHER:  The time
10 is 7:05 p.m.  We're off the record.
11          (Whereupon, a brief recess was held)
12          THE VIDEOGRAPHER:  The time
13 is 7:09 p.m.  We're back on the record.
14          THE WITNESS:  Okay.  What I'm
15 going to do now is I completed the welding
16 process.  I'm just going to assemble the stock
17 and the firing mechanism.  I'm going to
18 actually try both of them.  It makes a
19 difference.
20 BY MR. STEIN:
21     Q.  How long did the actual welding

40

1 process take?
2     A.  I didn't time it.  They timed
3 it.
4     Q.  Was it less than a minute?
5     A.  What's that?
6     Q.  Was it less than a minute?
7     A.  No.  It was not less than a
8 minute.  I mean, the actual burring it?
9     Q.  Yes.
10     A.  Probably two minutes.
11     Q.  Okay.  Thank you.
12     A.  But the set-up there worked
13 sufficiently in this one.  I'll try the
14 original stock that I used originally to see
15 how it works.  And it's working fine now.
16          We ready to move that way?
17          THE VIDEOGRAPHER:  Okay.  The
18 time is 7:10 p.m.  We're off the record.
19          (Whereupon, the parties moved to the
20          firing range and the following
21          proceedings were held)

41

THE VIDEOGRAPHER: The time is 7:16 p.m. We're on the record.

THE WITNESS: One again, I'll reload the magazine with three rounds and go directly to the automatic position and shoot the automatic position and then I will shoot semiautomatic position. Ready?

The magazine is out. Weapon's on safety. I'm going to load three more rounds and shoot it semiautomatic.

The reason I'm manipulating it is because the slitting lost the tension with the heat and I'm making sure it gets put into the slit.

The weapon is on semi-automatic and fire three rounds in semiautomatic.

MR. GARDINER: Do you have enough to do a five-round burst?

THE WITNESS: I should..

I'm going to use the Federal

42

because I had -- I'm loading the magazine with five rounds of Federal ammunition. The original ammunition was military ball. I'm putting the selector on the automatic position. Ready.

Five rounds automatic.

The weapon is clear. Off the record.

THE VIDEOGRAPHER: The time is 7:19 p.m. We're off the record.

(Whereupon, a brief recess was taken)

THE WITNESS: All right. We'll go back to -- you have questions you wanted to be doing in that room?

MR. GARDINER: Doesn't matter.

(Whereupon, the following proceedings were held in the conference room)

THE VIDEOGRAPHER: The time is 7:29 p.m. We're back on the record.

BY MR. STEIN:

43

Q.   So what you have just finished demonstrating was the Serial No. 1392697 firing both in the semiautomatic and automatic firing position?

A.   That's correct.

Q.   And so that that receiver in your opinion is a fully automatic machine gun?

A.   Yes, it is.

MR. STEIN: No further questions.

MR. GARDINER: I just have a few questions.

CROSS-EXAMINATION

BY MR. GARDINER:

Q.   Prior to the conversion that we just saw tonight, how many other conversions did you either attempt or complete?

A.   Just the two that were used in the previous trial.

Q.   The two that is involving the welded receiver. I don't remember the serial

44

number.

A.   Yes. The one involving the welding receiver and the one involving the LRB receiver.

Q.   The forged receiver?

A.   The forged received.

Q.   And other than those three, have you attempted any other conversions on an M-14A rifle?

A.   I have never drilled out or modified an M-14 that had had parts welded together to make it fire automatically.

Q.   Okay. Did you ever attempt to do that with any of the MKS M-14A receivers?

A.   No, I did not.

Q.   So the first one you did then was the welded receiver that was used in the criminal case, what we are calling the exemplar?

A.   Correct.

Q.   And the second one was the

45

1  forged receiver?

2       A.   Yes, sir.

3            MR. GARDINER:  I don't have

4  any other questions.

5            REDIRECT EXAMINATION

6  BY MR. STEIN:

7       Q.   I'd like you to point out, if

8  you would, the weld that you added to the

9  receiver at the end of the process.

10      A.   Okay.  What I'm going to do is

11 remove the firing mechanism and take the stock

12 assembly off the receiver.  The weld is on the

13 inside corner of the sear release.

14           Without a measurement, I would say

15 it's approximately an eighth of an inch wide

16 and probably a sixteenth of an inch above the

17 level of the original sear release.

18           THE VIDEOGRAPHER:  Point it

19 out one more time.

20           THE WITNESS:  Right here.

21           MR. STEIN:  I have no further

46

1  questions.

2            RECROSS-EXAMINATION

3  BY MR. GARDINER:

4       Q.   And how far out beyond the edge

5  of the sear release did it go?

6       A.   Probably -- I mean, thirty

7  seconds of an inch.

8       Q.   Is that, the thirty seconds of

9  an inch, that goes out beyond the edge there,

10 is that significant to the firing process?

11      A.   No.  My intent was to build it

12 out that way slightly.  And that's just

13 overflow that went up and out.

14      Q.   So you were building it out...

15      A.   Towards the rear of the

16 receiver.

17      Q.   And how about the building it

18 up?

19      A.   My intent wasn't to build it up.

20 It's just that's where the weld went.

21      Q.   And so the only significant part

47

1  of the weld was the building it back?

2       A.   Yes.

3       Q.   And why was that?

4       A.   Well, I'll demonstrate with

5  putting the firing mechanism in.  And when it's

6  in the automatic position, you can see the sear

7  release rock.

8            And when it goes forward, the

9  connector connects to the front of the

10 operating rod probably eighth of an inch.

11           And that pull forward pushes the sear

12 release to the rear and then hits the seer and

13 disengages the hammer.

14           So basically when it goes into battery

15 and the bolt closes, the engagement happens up

16 here, which causes engagement to the rear and

17 it allows the firearm to fire automatically.

18      Q.   And it wasn't firing

19 automatically on the first attempt because the

20 width of the back part of the sear release

21 wasn't back far enough to touch the sear?

48

1       A.   That is correct.  When I drilled

2  my hole, I just eyeball where the center was,

3  and I obviously got it off center probably a

4  sixteenth of an inch.

5       Q.   Now, if you had drilled the hole

6  farther back, say a sixteenth of an inch, do

7  you believe that additional weld would not have

8  been necessary?

9       A.   No.  I do not.

10           MR. STEIN:  Wait.  Do you

11 believe it would not have been necessary?

12           THE WITNESS:  That's correct.

13 If I had drilled the hole in the exact center,

14 then my sear release would have been rearward

15 approximately a sixteenth of an inch, which

16 would allow the engagement on the sear.

17 BY MR. GARDINER:

18      Q.   Okay.  That brings up another

19 question.

20           Can you take the Sear release off

21 there so we can look at the hole again then?

49

1    A.   Sure.  Do you want to stop it
2  while I go get a punch and hammer.
3         THE VIDEOGRAPHER:  The time
4  is 7:34 p.m.  We're off the record.
5         (Whereupon, a recess was taken)
6         THE VIDEOGRAPHER:  The time
7  is 7:35 p.m.  We're back on the record.
8         THE WITNESS:  You can see how
9  egg-shaped my hole is.
10 BY MR. GARDINER:
11   Q.   And why is that?
12   A.   Because I was doing it with a
13 Dremmell tool and a grinding bit, and I cut it
14 with as much finesse as I could, and it just
15 did not have that much finesse.
16        THE VIDEOGRAPHER:  Okay.
17 Show me what we're looking at.
18        THE WITNESS:  This hole
19 through here.
20 BY MR. GARDINER:
21   Q.   And you believe that if the hole

50

1  was set back a sixteenth of an inch...
2    A.   Or even if the front wall had
3  not been cut out so much.  You see how it's in
4  basically exact center from side to side.  It's
5  egg-shaped.
6         MR. GARDINER:  That's all I
7  have.
8             REDIRECT EXAMINATION
9  BY MR. STEIN:
10   Q.   Could you have done the same
11 welding process with a simple welding torch?
12   A.   Since the weld was only on the
13 sear release, you could have done it with a
14 brazing rod.  It wouldn't have created any --
15 with gas, map gas or something like that, or
16 you could have even soldered just a little
17 piece of rod on there.  Because all you're
18 doing is making a build-up.
19   Q.   Okay.  And would the equipment
20 to do that be something that any hobbyist would
21 have in his garage?

51

1    A.   If he was any type of hobbyist
2  that worked on metals, he would most likely
3  have some type of torch.
4    Q.   And I'm not sure that we covered
5  it, but in terms of the actual amount of time
6  that you were actually soldering as opposed to
7  your setup time, about how long was that?
8    A.   I wasn't looking at the camera
9  and the actual weld.  I would just have to say
10 a matter of minutes.
11        MR. STEIN:  Okay.  I have no
12 further questions.
13        MR. GARDINER:  I guess the
14 deposition's over.
15        THE VIDEOGRAPHER:  Okay.  The
16 time is 7:37 p.m.  We're off the record.
17        (Whereupon, the deposition concluded
18        at 7:37 p.m.)
19             - - -
20
21

52

1              CERTIFICATION OF NOTARY
2  I, Brian M. McDonald, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me stenographically and thereafter
8  reduced to typewriting by me; that said
9  deposition is a true record of the testimony
10 given by said witness; that I am neither
11 counsel for, related to, or employed by any
12 parties to the action in which this the parties
13 to the action in which this deposition is
14 taken; and further, that I am not a relative or
15 employee of any attorney or counsel employed by
16 the parties thereto, nor financially or
17 otherwise interested in the outcome of action.
18
19         Brian M. McDonald
20     Notary Public - State of West Virginia
21     My Commission Expires:  July 1, 2012

# APPENDIX 2



- 2001 V007

RV

FILED ___ LODGED
RECEIVED ___ COPY

RECEIVED

APR 16 20

2004 APR 19  A  C 57

U.S. ATTORNEY
TUCSON, AZ

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|                                      |                           |
|--------------------------------------|---------------------------|
| UNITED STATES OF AMERICA,            | No. CV 02-264-TUC-RCC     |
|     Plaintiff,                       | ORDER                     |
| vs.                                  |                           |
| ONE TRW U.S. RIFLE, MODEL 14         |                           |
| 7.62x51 mm caliber, S/N 593006,      |                           |
|     Defendant.                       |                           |

Pending before the Court are Plaintiff's October 17, 2003 Motion for Summary Judgment and Plaintiff's December 16, 2003 Motion to Strike Claimant's Opposition to Plaintiff's Motion for Summary Judgment. The Court heard oral arguments on April 5, 2004. After considering the parties' briefs and arguments, the Court will deny the Motion to Strike and grant Plaintiff's Motion for Summary Judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Mark Travis Brown ("Claimant") purchased Defendant from MK Specialties in February 1999. In March 1991, Claimant attempted to sell Defendant to a federal firearms licensee, West of the Pecos, in Tucson. The manager of West of the Pecos was hesitant to purchase the property and contacted the Bureau of Alcohol, Tobacco and Firearms ("ATF") to inquire about its classification. (SOF ¶6). ATF Special Agent Robert Lowery contacted Claimant and verified that he was in possession of the property. Special Agent Lowery then

1   learned from the ATF's Firearms Technology Branch ("FTB") that, after examination, it was
2   determined that other similar firearms were machineguns within the meaning of 25 U.S.C. §
3   5845(b). Claimant met with Special Agent Lowery on May 8, 2001 at the ATF Tucson Field
4   Office and Defendant was seized under the authority of 26 U.S.C. § 5872(a). After
5   conducting a search of the National Firearms Registration and Transfer Record ("NFRTR"),
6   Special Agent Lowery determined that the defendant property is not registered to Claimant
7   or to any other person.

8        On May 23, 2002, Plaintiff filed this forfeiture action claiming that Defendant is a
9   machinegun as defined in 26 U.S.C. § 5845(b), is not registered in the NFRTR, as required
10  by 26 U.S.C. § 5841, and is thus possessed in violation of 26 U.S.C. § 5861(d). Claimant
11  filed a claim regarding Defendant on July 8, 2002 and asked that it be returned to him.
12  Plaintiff filed this Motion for Summary Judgment on October 17, 2003 and Claimant
13  requested Oral Argument on January 30, 2004. Also pending is Plaintiff's Motion to Strike
14  Claimant's Opposition on the grounds that the scheduling order was violated.

15  **MOTION TO STRIKE**

16  Plaintiff's Motion

17       On December 16, 2003, Plaintiff filed its Motion to Strike requesting that the Court
18  strike Claimant's Opposition to Plaintiff's Motion for Summary Judgment as a sanction for
19  his failure to comply with Rules 26 and 56 of the Federal Rules of Civil Procedure and Rules
20  1.9 and 1.10 of the Rules of Practice of the United States District Court for the District of
21  Arizona ("Local Rules"). Plaintiff argues that Claimant failed to identify Arthur Douville
22  as a person with discoverable information or as a witness. Therefore, Claimant argues,
23  attaching his Declaration in support of the Opposition violates the scheduling order. Plaintiff
24  contends that the failure to disclose this information is not justified and is not harmless.
25  Finally, Plaintiff argues that the Opposition did not comply with the form prescribed by the
26  Local Rules because it is not typed on pleading paper, the title of the court begins above line
27  6, the left margin is less than 1 ½ inches, and the font size is smaller than 13 point (See Rule

28

                                        - 2 -

1   1.9). Plaintiff also argues that Claimant far exceeded the page-limit requirement of Rule

2   1.10(e).

3   **Claimant's Opposition**

4       Claimant responds to the Motion by arguing that he is in compliance with Rule 26(e),

5   which requires him to supplement disclosures "at appropriate intervals." *See* FED.R.CIV.P.

6   26(e). He asserts that he did not become aware of Arthur Donville until late June, 2003 and

7   was not provided with his photographs until early July. Further, Claimant did not know that

8   his expert would rely on the photographs to form an opinion until late August 2003. The

9   photographs were not actually examined, however, until October 7, 2003, because of an

10   intervening objection by Plaintiff which required a Court ruling. Claimant argues that

11   Plaintiff was informed at the appropriate intervals of discovery and has suffered no harm.

12   Finally, Claimant concedes that he did violate the Local Rules, but argues that because his

13   failure to comply was non-willful, he should not lose his right to file an opposition to the

14   Government's motion for summary judgment.

15   **Legal Standard and Analysis**

16       Failure to comply with the scheduling order allows the judge "upon motion or the

17   judge's own initiative" to "make such orders with regard thereto as are just, and among others

18   any of the orders provided in Rule 37(b)(2)(B), (C), (D)." FED.R.CIV.P. 16(f). The Ninth

19   Circuit has stated that "although we review every discovery sanction for an abuse of

20   discretion, we give particularly wide latitude to the district court's decision to issue sanctions

21   under Rule 37(c)(1)." *Yeti By Molly Ltd v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th

22   Cir. 2001). Since the district court has broad authority to sanction a party for violating Rule

23   26(e)(1), it is within the Court's discretion to determine whether discovery was supplemented

24   at an "appropriate interval." *Id.*

25       District courts have "broad discretion in interpreting and applying their local rules."

26   *Delange v. Dutra Const. Co.*, 183 F.3d 916, 919 (9th Cir. 1999) (quoting *Miranda v. S.P.*

27   *Tansp.*, 710 F.2d 516, 521 (9th Cir. 1983)). However, the district court cannot enforce Local

28

- 3 -

1  should be sustained unless it was arbitrary, capricious, an abuse of discretion, or otherwise

2  contrary to law. The NFA describes a machinegun as:

> Any weapon which shoots, is designed to shoot, or can be readily
> restored to shoot, automatically more than one shot, without manual
> reloading, by a single function of the trigger. The term shall also
> include the frame or receiver of any such weapon, any part designed
> and intended solely and exclusively, or combination of parts designed
> and intended, for use in converting a weapon into a machinegun, and
> any combination of parts from which a machinegun can be assembled
> if such parts are in the possession or under the control of a person.

7  26 U.S.C. § 5845(b).

8  In this case, Plaintiff asserts the property satisfies each of these criteria because it is designed

9  to shoot automatically and additionally, because it can be readily restored to shoot.

10  In support, Plaintiff offers the FTB report, which states that it has the same design

11  features of a machinegun as the select fire M-14 receivers from which it was assembled.

12  Further, this property was properly classified as a machinegun under the NFA. Plaintiff

13  asserts the M-14 has been classified by the ATF as a machinegun since 1978 and Defendant

14  is an M-14 receiver that was remanufactured from receivers that were previously cut in half.

15  Plaintiff further contends that the readily restorable test is satisfied where a firearm

16  can be made capable of renewed automatic operation even if the restoration required the

17  application of some degree of skill and the use of some tools and parts. *See e.g. U.S. v.*

18  *Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (readily restorable even though to do so would take

19  about an eight-hour working day in a properly equipped machine shop); *U.S. v. One*

20  *Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, Serial No. 85279*, 278

21  F.Supp.2d 888 (W.D.Mich. 2003) (weapon is readily restorable if it can be made capable of

22  automatic operation through some form of restoration, including restoration requiring a

23  degree of skill and the use of tools and parts" citing *Smith*). In this case, Plaintiff argues that

24  Defendant can be readily restored to shoot by cutting of the sear release, drilling out the

25  selector shaft, and installing new parts (modifications were made in forty-five minutes using

26  easily available hand tools). Plaintiff contends that while Claimant's expert disagrees in

27

28

1   Rules that contravene the Federal Rules of Civil Procedure. *Atchison, Topeka and Santa Fe*
2   *Railway Co. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998). "[A] local rule imposing
3   a requirement of form shall not be enforced in a manner that causes a party to lose rights
4   because of a nonwillful failure to comply with the requirement." FED.R.CIV.P. 83(a)(2).

5        Having reviewed the parties' briefs, the Court finds that the failure to disclose Arthur
6   Douville as a person with discoverable information or as a witness is harmless to Plaintiff.
7   Further, Claimant's violations of Local Rules 1.9 and 1.10 are non-willful. For these reasons,
8   the Court will not strike Claimant's Opposition.  Plaintiff's Motion to Strike is therefore
9   denied.

10  **SUMMARY JUDGMENT**

11  Plaintiff's Motion

12       Plaintiff argues that the Court should grant summary judgment because there is no
13  genuine issue as to any material fact and it is entitled to judgment as a matter of law. *See*
14  FED.R.CIV.P. 56(c).  Plaintiff contends that its Complaint, affidavit, Statement of Facts, and
15  attached exhibits show that: 1) the defendant property is a machinegun within the meaning
16  of the National Firearms Act ("NFA"); 2) the Claimant possessed the defendant property; and
17  3) the defendant property was not registered to Claimant in the NFRTR.  Plaintiff further
18  argues that the government has established that the property is subject to forfeiture and has
19  met its initial burden to demonstrate probable cause to believe that the property was used in
20  violation of the law which in this case is the Claimant's possession of the property without
21  proper registration. In applying the totality of the circumstances test, Plaintiff argues that the
22  government had probable cause in this case and this "unrebutted showing of probable cause
23  is sufficient by itself to warrant a judgment of forfeiture." *U.S. v. $5,644,540.00 in U.S.*
24  *Currency*, 799 F.2d 1357, 1362 (9th Cir. 1986) (citing *U.S. v. Little Al*, 712 F.2d 133, 136
25  (5th Cir. 1983)). Plaintiff further asserts that in establishing whether or not Defendant is a
26  machinegun, the applicable standard of review is the arbitrary and capricious standard and
27  the ATF's determination that the property is a machinegun within the meaning of the NFA
28

- 4 -

1   some minor respects with the description of the restoration procedure,[1] these differences do

2   not rise to the level of a disputed issue of material fact.  Even with the additional step

3   believed necessary by Claimant's expert, the process would involve less than "an 8-hour

4   working day in a properly equipped machine shop."  *Smith* at 400.

5   Claimant's Opposition

6          Claimant responds that Plaintiff has not met its initial burden of showing that the

7   defendant property is a machinegun within the meaning of 26 U.S.C. § 5845(b) because that

8   assertion is based solely upon a report by Richard Vasquez which is not a pleading,

9   deposition, answer to interrogatory, admission on file, or an affidavit and thus cannot be

10  considered by the Court for this purpose.  Claimant argues that while Plaintiff is correct that

11  the government need only show probable cause to believe that the property was used in

12  violation of the law for forfeiture, the statute as applied is unconstitutional and violates the

13  equal protection component of the Fifth Amendment.  By treating forfeitures of firearms

14  under 26 U.S.C. § 5872(a) differently than forfeitures of other property, it is not rationally

15  related to a legitimate state interest.  Thus, Claimant concludes, these forfeitures should not

16  be exempt from 18 U.S.C. § 983(c)(1) and the government must meet its initial burden of

17  persuasion by a preponderance of the evidence, which it has not done.

18         Claimant argues that the standard of review in deeming whether the property is a

19  machinegun is not the arbitrary and capricious standard proposed by the government; rather,

20  it is for the Court to apply the ordinary rules of statutory construction and if left with an

21  ambiguous statute, to apply the rule of lenity and resolve the ambiguity in favor of Claimant,

22  *U.S. v. Thompson/Center Arms Co.*, 504 U.S. 505, 518 (1992).  As to the definition of a

23  machinegun, Claimant asserts that according to the statute it is the weapon and not the

24  receiver which must be designed to shoot or can be readily restored to shoot automatically.

25

26  [1]

27  Michael Kelly, Sr. testified that he believed it would be necessary to begin the restoration
    procedure by adding metal to the receiver by a welding process (a step not used by Mr.

28  Vasquez, Plaintiff's expert).

                                        - 6 -

FROM :                        FAX NO. :                           Mar. 25 2005 03:17PM  P8/12

APR.20.2004  10:26AM                ─                        NO.765   P.8/12

1   Defendant is not designed to shoot because it is not assembled from M-14 receiver halves
2   and does not have the features which allow it to shoot automatically.  However, Claimant
3   asserts that MKS M-14A receivers were manufactured and not assembled from M-14
4   receivers that had been torch cut into 2 sections (rear and front) which removed some of the
5   metal from the center of the M-14 machinegun receivers and thus does not have the same
6   design features of a machinegun as the select fire M-14 receivers from which it was
7   assembled.  Further, the fact that the M-14 receiver is a machinegun receiver does not mean
8   that the MKS M-14A receiver must therefore also be a machinegun receiver. Claimant also
9   argues that when it engages in statutory construction, the Court must interpret the words of
10  a statute as taking their ordinary, contemporary, common meaning. *Perrin v. U.S.*, 444 U.S.
11  37, 42 (1979).  Since certain words of the statute are not defined by the statute, their common
12  meaning must be applied.  Applying this standard, to determine if the receiver is "designed"
13  to shoot automatically, reference must be made to the "selection and arrangement" of the
14  rifle's "functional elements."  Here, the designer of the MKS M-14A selected and arranged
15  the functional elements of it so that would not shoot automatically.
16      Claimant asserts that Defendant cannot be readily restored to shoot automatically
17  because "restorable" means that an object was previously in a particular condition and may
18  be returned to that previous condition. In this case, the receiver was created from scrap metal
19  into a new and previously nonexisting condition.  Further, Claimant argues that the
20  modifications which would have to be made to convert the defendant property into the M-14
21  configuration would require GTAW welding.[2]  Even if the process to convert defendant
22  property is considered a restoration, it could not be done readily[3] because the process would
23
24  _____
    [2]
25  This type of welding is not a simple process and requires special training (attending a
    vocational technical school).  The GTAW welding set-up includes the machine and
26  required accessories, argon gas cylinder, regulator, torch with leads, and foot pedal
    control, which cost a minimum of $2,000.
27  [3]
28  Defined as without hesitation; without delay; quickly; without difficulty.  *U.S. v. Seven*

                              - 7 -

1    take some five hours of labor by a highly trained welder and machinist using expensive
2    equipment. Moreover, even the process outlined by Plaintiff's expert would take some forty-
3    five minutes and involved making alterations to the structure of the receiver by a highly
4    experience gunsmith. Claimant argues that the Court should use the standard of a person of
5    average intelligence with little or no special training or equipment to determine who must
6    readily restore the property. *U.S. v. Whalen*, 337 F.Supp. 1012 (S.D.N.Y. 1972).

7    <u>Legal Standard</u>

8         Summary judgment is proper where no genuine issue as to any material fact exists and
9    the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v.*
10   *Catrett*, 477 U.S. 317, 322 (1986). The initial burden rests on the moving party to point out
11   the absence of any genuine issue of material fact, but the moving party need not support its
12   motion with affidavits or other supporting materials. FED.R.CIV.P. 56(a); *Celotex*, 477 U.S.
13   at 323. Once satisfied, the burden shifts to the opponent to demonstrate through production
14   of probative (and admissible) evidence that an issue of fact remains to be tried. *Id.* at 323-24.
15   The non-moving party may not rest on mere denials of the movant's pleadings, but must
16   respond asserting specific facts showing a genuine issue exists precluding a grant of
17   summary judgment. FED.R.CIV.P. 56(e); *Celotex*, 477 U.S. at 324. The Court must accept
18   the non-movant's evidence as true and view all inferences in the light most favorable to the
19   non-movant. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

20        The standard of probable cause to support a forfeiture action is similar to that required
21   to obtain a search warrant. *U.S. v. Real Property 874 Gartel Drive, Walnut Ca.*, 79 F.3d 918,
22   922 (9th Cir. 1996). The government need only prove that it had reasonable grounds to
23   believe that the property was involved in the alleged offense and that belief may be supported
24   by hearsay evidence. *Id.* "[T]he government need only establish probable cause that the
25   defendant property was involved in the alleged underlying offense, following which the
26
27   _____
28   *Miscellaneous Firearms*, 503 F.Supp. 565, 573 (1980).

- 8 -

1  burden shifts to the claimant to establish by a preponderance of the evidence that the
2  defendant property is not subject to forfeiture." *Id.* at 923.

3  Analysis

4       In this case, the Court finds that Plaintiff has established probable cause for
5  forfeiture. The manager from West of the Pecos contacted the ATF with his suspicions about
6  Defendant and Special Agent Lowery established that Claimant was in possession property
7  which may have been a machinegun. Further, a search of the records show that Defendant
8  is not registered to Claimant. Since probable cause has been established, the burden now
9  shifts to Claimant to show that his property is not subject to forfeiture. There is no dispute
10 that the property is not registered, so the remaining point is whether or not it is a machinegun
11 under the NFA.

12      The Court applies the arbitrary and capricious standard to the NFA's definition of a
13 machinegun. Considerable weight should be given to an executive department's construction
14 of a statutory scheme it is entrusted to administer. *U.S. v. Mead Corp.*, 533 U.S. 218, 227-28
15 (2001) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, et al.*, 467 U.S.
16 837, 844 (1984)). "The fair measure of deference to an agency administering its own statute
17 has been understood to vary with circumstances, and courts have looked to the degree of the
18 agency's care, its consistency, formality, and relative expertness, and to the persuasiveness
19 of the agency's position." *Id.* Two recent cases that are directly on point have also used the
20 arbitrary and capricious standard when looking at the NFA's definition of a machinegun. *See
21 e.g., U.S. v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber Serial Number
22 85279, 278 F.Supp.2d 888 (W.D.Mich. 2003); U.S. v. One TRW, Model M14, 7.62 Caliber
23 Rifle Serial Number 1488975 from William K. Alverson, 294 F.Supp.2d 896 (E.D.Ky. 2003).*

24      The Court finds that Defendant is a machinegun as defined in the NFA and that the
25 ATF did not abuse its discretion in determining it to be the same. Defendant is designed to
26 shoot automatically and also can be readily restored to do so. Claimant was in possession

27

28

1  of Defendant without proper registration in violation of the law.  For all these reasons, the

2  Court finds that summary judgment in favor of Plaintiff is proper.

3        Accordingly,

4        IT IS HEREBY ORDERED that Plaintiff's Motion to Strike Claimant's Opposition

5  to Plaintiff's Motion for Summary Judgment (Docket No. 42) is DENIED.

6        IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment

7  (Docket No. 35) is GRANTED.  Defendant Property is ordered FORFEITED.

8        IT IS ALSO ORDERED that the Clerk of the Court enter judgment accordingly and

9  CLOSE THE CASE.

10

11

12        DATED this 14th day of April, 2004.

13

14

15                                    FRANCES C. COLLINS
                                      United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      - 10 -

# APPENDIX 3

Post-it® Fax Note 7671

To: Esteban Sanchez
Co./Dept.
Phone #
Fax # 217/373-5891

From: Judge Cudmore (Lesa)
Co.
Phone #
Fax #

TES DISTRICT COURT
NOIS, SPRINGFIELD DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
-vs- )
)
ONE (1) MKS / WINCHESTER )
MODEL M14 MACHINE GUN )
RECEIVER, Serial #204143, )
ONE (1) MKS / TRW MODEL )
M14 MACHINE GUN RECEIVER, )
Serial #1393707, )
)
Defendants. )

No. 02-CV-3281

ORDER

BEFORE BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This is a civil action *in rem* brought to enforce the provisions of 26 U.S.C. 5872, for the forfeiture of two machine gun receivers listed in the above caption which the Government alleges were involved in violations of the provisions of the *National Firearms Act* (NFA), 26 U.S.C. 5801-5872. Defendants are One (1) MKS/Winchester Model M14 Machine Gun Receiver, Serial #204143, and One (1) MKS/TRW Model M14 Machine Gun Receiver, Serial #1393707. Government alleges each of the above listed receivers is a machine gun as that term is defined in 26 U.S.C. 5845(b).

Page 1 of 7

On October 28, 2002, the Government filed its Verified Complaint for Forfeiture (d/e 1).  On December 18, 2002, John Brown filed a Claim of Ownership and Petition for Remission or Mitigation of Forfeiture (d/e 10).  On June 30, 2003, this matter was consented to U.S. Magistrate Judge Cudmore pursuant to the provisions of 28 U.S.C. 636(c).  (See d/e 15.)   On December 16, 2003, a bench trial was held in the above cause.   Esteban F. Sanchez represented the Government and Peter C. Drummond represented Claimant John Brown.

## STATUTORY SCHEME

Once property is seized for forfeiture by the government and a claim of ownership is filed, the government must satisfy its initial burden by demonstrating that it had probable cause to believe that the property was used in violation of law. See Customs Law, 19 U.S.C. 1615.  If the government establishes probable cause, the burden shifts to the claimant to establish by a preponderance of the evidence that the property was not related to the violation of law.  19 U.S.C. 1615.  If the claimant satisfies this burden, the burden shifts back to the government, requiring the proffer of "probative admissible evidence to contest the claimant's proof."  United States v. $129,727.00 U.S. Currency, 129 F. 3d 486, 492 (9th Cir., 1997).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon consideration of the evidence presented at trial, including the testimony, stipulations, and documents received in evidence, the Court makes the following findings of fact and conclusions of law:

The Bureau of Alcohol, Tobacco, and Firearms (ATF) received information that Claimant John Brown purchased MK specialties M14 receivers from a federal firearm licensee named Norman Ismari.  ATF Agent David Cline contacted Claimant John Brown who referred Special Agent Cline to Peter Drummond, an attorney of Staunton, Illinois.  At Claimant's request ATF seized the two receivers at issue herein.[1]  The seizures occurred on April 30, 2002.  This Court has jurisdiction over this matter by virtue of 28 U.S.C. 1345, 1355 as the property was seized in Gillespie, Macoupin County, Illinois, in the Central District of Illinois.

The seized receivers obtained from Attorney Drummond were forwarded to the Firearms Technology Branch (FTB) of ATF in Washington, D.C.  An examination of the two receivers by Enforcement Officer Richard Vasquez[2] determined that each receiver had been re-manufactured from M14 receivers

---

[1] Government's Exhibit #1 is one MKS/Winchester Model M14 Machine Gun Receiver, Serial #204143.  Government's Exhibit #2 is one MKS/TRW Model M14 Machine Gun Receiver, Serial #1393707.

[2] At trial claimant stipulated and agreed that Enforcement Officer Vasquez was an expert in the field of M14 firearms.

that had been previously cut in half.  FTB Enforcement Officer Vasquez testified that the M14 has been classified as a machine gun under the NFA since approximately 1958.  Enforcement Officer Vasquez testified as to the manner in which each receiver is readily restorable to be classified as a machine gun under the NFA.  That testimony indicated that using common shop tools Government's Exhibit #1 could be restored to shoot automatically in approximately 45 minutes, which includes the reinstallation of readily available parts.  The testimony as it related to Government's Exhibit #2 was that some additional welding would be required, taking an additional 20 minutes, or a total of approximately 65 minutes, to restore the receiver to shoot automatically.  Most importantly, Enforcement Officer Vasquez testified that both Defendant receivers retained the three critical designs for fully automatic firing, being: 1) a selector stud;  2) a connector groove; and 3) a connector slot.  The Court finds the testimony of Enforcement Officer Vasquez to be credible.

The NFA, at 26 U.S.C. 5845(b), defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine

Case 1:04-cv-00041-IMK   Document 39   Filed 05/18/05   Page 35 of 39   PageID #: 135
03-30-05   12:26   From-ATF COLUMBUS FIELD DIVISION   +   T-781   P.22/24   F-782

gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person". Therefore, the issue is whether the Defendant receivers were designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading by a single function of the trigger. Based upon the credible expert testimony of Enforcement Officer Vasquez, the answer to that question is a resounding "yes". Both receivers were designed to shoot and both receivers, Government's Exhibit #1 and Government's Exhibit #2, are readily restorable sufficient to classify each receiver as a machine gun under the NFA.[3]

It is undisputed that the Claimant possessed the Defendant properties. (See d/e 10.) The sole remaining issue is whether or not the Defendant receivers were registered to the Claimant in the National Firearms Registration and Transfer Record. The Government has carried its burden of proof on this element as well. See Government Exhibit #5 admitted without objection showing that each Defendant receiver is not registered in the National Firearms Registration and Transfer Record to any person.

The Claimant raises an equal protection argument. However, that argument was never fully developed at the bench trial, and clearly under these

---

[3] See U.S. v. Smith, 477 F.2d 399, 400 (8th Cir., 1973). A firearm satisfies the "readily restorable" test if it can be made capable of automatic operation through some form of restoration, including restoration requiring a degree of skill and the use of tools and parts.

facts is a red herring without any validity. The Claimant also argues that because the Defendant receivers were re-manufactured by welding two halves of M14 receivers together into a whole, that somehow that fact negates the application of 26 U.S.C. 5845(b) cited above. Based upon the testimony of Enforcement Officer Vasquez, it is clear that the Defendant receivers had been re-manufactured by welding two halves of previously cut M14 receivers back together. One part of each receiver clearly retained the serial number of an M14 receiver. The Court finds that it is irrelevant to the statutory scheme at issue that the other receiver half may have been from another M14 receiver. If re-manufactured receivers were outside the statutory definition, the intent of the statute could be negated by mere substitution of receiver parts. That cannot be the intended result. The Court finds that Claimant re-manufactured receiver argument does not negate the application of 26 U.S.C. 5845(b) to the Defendant receivers under these facts.

## CONCLUSION

Based upon the above, and based upon precedent which is directly on point, though not controlling, involving M14 receivers similar if not identical to the Defendant M14 receivers herein[4], Claimant's Petition for Remission or Mitigation of Forfeiture (d/e 10) is DENIED and JUDGMENT IS HEREBY ENTERED on

---

[4] See U.S. v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, 278 F.Supp.2d 888 (W.D., Mich., 2003).

# APPENDIX 4

## 27 CFR 179.11: MEANING OF TERMS

**The YAC STEN MK II carbine is a machine gun as defined in the National Firearms Act.**

### ATF Rul. 83-5

The Bureau of Alcohol, Tobacco and Firearms has examined a firearm identified as the YAC STEN MK II carbine. The YAC STEN MK II carbine is a 9 millimeter caliber firearm which has identical design characteristics to the original selective fire STEN submachine gun designed by Reginald Vernon Shepherd and Harold John Turpin. The weapon is blowback operated and fires from the open bolt position with the bolt incorporating a fixed firing pin. In addition, a component part of the weapon is a trip lever (disconnector) which has been modified to prevent more than one shot being fired with a single function of the trigger.

The trip lever (disconnector) is designed in such a way that a simple modification to it, such as bending, breaking or cutting, allows the weapon to operate automatically. Thus, this simple modification to the trip lever (disconnector), together with STEN submachine gun design features and components in the YAC STEN MK II carbine, permits the firearm to shoot automatically, more than one shot, without manual reloading by a single function of the trigger. The above combination of machine gun design features as employed in the YAC STEN MK II carbine are not normally found in the typical sporting firearm.

The National Firearms Act, 26 U.S.C. 5845(b), defines a machine gun to include any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

The "shoots automatically" definition covers weapons that will function automatically. The "readily restorable" definition defines weapons which previously could shoot automatically but will not in their present condition. The "designed" definition includes weapons which have not previously functioned as machine guns but possess specific machine

gun design features which facilitate automatic fire by simple alteration or elimination of existing component parts.

**Held:** The YAC STEN MK II carbine is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. Consequently, the STEN MK II semiautomatic carbine is a machine gun as defined in Section 5845(b) of the Act.

[ATFB 1983-3 35]

## CERTIFICATE OF SERVICE

I, Michael D. Stein, Chief, Asset Forfeiture and Money Laundering Section for the Northern District of West Virginia, hereby certify that on this 17th day of May, 2005, the foregoing GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT were served upon counsel for claimants, Michael J. Kelly, Sr., William Thomas and Gary Beach, addressed as follows by placing a true copy in the United States Mail, postage prepaid, addressed as follows:

> Richard E. Gardiner, Esq.
> Suite 404
> 10560 Main Street
> Fairfax, VA 22030

and upon the following claimants:

Eugene Gzsanka
323 California Street
Campbell, CA 95008

Donald Sass
11695 Southwest Fairview Ln.
Tigard, OR 97223

Matthew Healey
2152 Shenandoah Drive
Grand Junction, CO 81503

Kevin Snodgrass
9505 Holmes Plaza # 5
Omaha, NE 68614

Cecil P. Smith
204 Crisp Road
Gastonia, NC 28056

Richard Vieira
11350 Calgary Road
Peyton, CO 80831

Francis Bliss, III
6205 Mindys Ridge
Fort Worth, TX 76126

Anthony Fabian
3872C South Genoa Circle
Aurora, CO 80013

Allan Fehlings
10438 Calumet Grove Drive
Fairfax, VA 22032

THOMAS E. JOHNSTON
UNITED STATES ATTORNEY

By: _____
Michael D. Stein
Chief, Asset Forfeiture and
    Money Laundering Section