IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

JUN 0 8 2005

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
|        v. | ) Civil No. 1:04CV41 |
| | ) |
| M-K SPECIALTIES MODEL M-14 | ) |
| MACHINEGUN SERIAL NUMBER | ) |
| 1447797, ET AL., | ) |
| | ) |
|     Defendants | ) |
| | ) |
| MICHAEL J. KELLY, SR. | ) |
| WILLIAM THOMAS | ) |
| GARY BEACH | ) |
| | ) |
|     Claimants | |

CLAIMANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CLAIMANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

COME NOW Claimants, by counsel, and i) pray that the court deny

Plaintiff's motion for summary judgment as Plaintiff is not entitled to

a judgment as a matter of law, and ii) move the court, pursuant to Rule

56, Fed.R.Civ.Pro., for summary judgment as there is no genuine issue

as to any material fact and Claimants are entitled to a judgment as a

matter of law.

<u>Introduction</u>

The Government correctly states in its Memorandum in support of its

motion for summary judgment ("Memorandum") at page 1 that the only issue

in the case is the legal question of whether the defendant receivers are

"machineguns" within the meaning of 26 U.S.C. § 5845(b), *i.e.*, can the

receivers be "readily restored" to shoot automatically or are they

"designed" to shoot automatically.  The Government is also correct that

it has the burden of showing, by a preponderance of the evidence, that

the receivers "can be readily restored" to shoot automatically or that they are "designed" to shoot automatically.   Memorandum at 2, n.2.

### Facts

The defendant receivers were manufactured from "demilitarized" M-14 machinegun receivers which had been demilitarized in or about 1975 and which were machined from commercial grade 8620 steel.   Affidavit of Michael J. Kelly, Sr. (hereinafter "Kelly Affidavit") at ¶ 3 (attached as Exhibit A).   The defendant receivers had been "demilitarized" by torch cutting them into two (2) sections, a rear section and a front section.   *Id.* at ¶ 4.   The torch cutting removed approximately 1/4" to 3/8" of metal from the center of the M-14 machinegun receivers.   *Id.* The rear section included, on the right side, a selector pivot housing or selector stud (hereinafter "selector stud").   *Id.*   The selector stud is a piece of metal which extends below the main body of the receiver and has a hole through which the selector shaft is mounted.   *Id.* at ¶ 5.   The selector stud measures approximately 21/32" (.66") long and 9/16" (.56") in height in the front and 15/32" (.47") in height at the center of the hole.   *Id.* at ¶ 5.   The top of the hole is approximately 5/32" (.16") below the main body of the receiver; the bottom of the hole is 13/32" (.41") below the main body of the receiver.   *Id.* at ¶ 5.

To manufacture the defendant receivers, a total of approximately 3/8" to 7/16" additional metal was first removed from each of the two (2) sections by torch-cutting from the left side of the receiver ends. *Id.* at ¶ 7.   Each of the defendant receivers was manufactured from a rear section and a front section of two (2) different M-14 receivers. *Id.* at ¶ 7.   Next, the selector stud was removed from the rear section

-2-

by grinding.  *Id.* at ¶ 8.[1]  A small nub measuring about 1/4" (.25") long by 1/8" (.13") in height remained.  *Id.*  After the selector stud was removed, the front and rear sections were placed on a weld fixture to ensure the precise length of the newly manufactured receiver.  *Id.* at ¶ 9.  About 1/2" to 5/8" of weld build-up using 8620 filler was added to the cut ends of the rear and front sections to restore the missing metal; the sections were then welded together with an approximate root opening of 1/4" to 3/8".  *Id.*  After welding, the joined sections were machined and heat-treated.  *Id.* at ¶ 10.

After completing the heat treatment process, a dummy, non-functional selector shaft and lock, and the upper portion of a sear release (which would be visible on the exterior of an M-14 machinegun receiver), were welded onto the completed receiver 1/16" to 3/32" forward of the position in which an actual selector shaft and lock, and the upper portion of a sear release, would have been located on an M-14 machinegun receiver.  *Id.* at ¶ 14.  Any excessive metal on the interior side of the completed receiver was removed by grinding.  *Id.*

In summary, the process of converting the defendant receivers to fire automatically involved "drill[ing] out the selector shaft that had been welded in place" and "cut[ting] off the remaining of the sear release with a Dremmell tool and a cutoff wheel."  Appendix 1 pp. 13.  The process is also described in footnote 8 of the Government's Memorandum, although the statement that ATF technician Vasquez "drilled

---

[1]  The selector stud was removed to comply with the instructions given by Edward M. Owen, Jr., Chief, Firearms Technology Branch, in a letter dated August 21, 1980 (copy attached as Exhibit B).  At the criminal trial of *United States* v. *Kelly*, No. 1:03CR50 (N.D. WV), Mr. Owen was a witness for the United States and authenticated this letter.

a hole in selector tab (sic) with a hand held <u>drill</u>" (Appendix 1 pp. 20-24)(emphasis added) is not correct.  In fact, there was no "selector tab" on the defendant receiver.  As Kelly's affidavit indicates, the selector stud (another name for the selector tab) had been removed and a dummy, non-functional selector shaft and lock, and the upper portion of a sear release were welded onto the receiver.  Moreover, Vasquez testified that he was going to "manually <u>cut</u> [the dummy, non-functional selector shaft] out using a carbide burr."  Appendix 1 p. 21 (emphasis added).  He did the "<u>cutting</u> with the Dremmell tool."  *Id.* (emphasis added).  He also "<u>cut</u> off the portion of sear release."  Appendix 1 p. 22 (emphasis added).  He then switched bits "to a conical type bit."  *Id.*  After about 30 minutes, he had "<u>cut</u> a hole completely through the shaft."  Appendix 1 p. 22-23 (emphasis added).  To clean up the hole "so the sear release will go over," he then cut again with the slitting disk, which took approximately 10 minutes.  Appendix 1 p. 23-24.

The Government also fails to mention Vasquez's qualifications, which he described in the criminal trial of *United States* v. *Kelly*, No. 1:03CR50 (N.D. WV).  Prior to working for ATF, he was a "firearms instructor and a gunsmith for Diplomatic Security Service" where he "would do the repairs of our agency firearms," including "replacing receivers, replacing barrels, triggers, stocks, every part besides the receiver."  Trial Transcript at 8-10 (attached hereto as Exhibit C).  Vasquez was also "in the United States Marine Corps for twenty-one years" where he was a "Chief Instructor at the Weapons Rebuild Facility at Quantico, Virginia," which is "a gunsmith facility where we handle all the special weapons that the Marine Corps provides to the Infantry

-4-

. . . ." *Id.* at 11.  His title was "advance armorer . . . ."  *Id.* at

11.  His training consisted of:

> a fifty-two week on-the-job training program where you learn
> how to be a basic gunsmith.  You don't learn just to take
> weapons apart.  You learn how to use a lathe, use a milling
> machine, use welders and actually fabricate parts to
> manufacture precision weapons . . . .

*Id.* at 12.

Vasquez also attended "the U.S. Army's Machinist Course" (*Id.* at

16-17), which was a "six-month course of learning how to fabricate

objects from using milling machines, grinders, welders, lathes that we

could use in our field."  *Id.* at 17.  Finally, Vasquez "attended

civilian gunsmith training courses," including the "Glock Arms course,

Smith and Wesson Armorers course several times, Heckler and Koch

Armorers course, Ruger."  *Id.* at 18.

With respect to the M-14, Vasquez "learned how to work on the M-14

in my initial armorer course in 1974 and then from that timeframe I was

associated with the M-14 my entire career."  *Id.* at 12.  At the Marine

Barracks, Naples, Italy, Vasquez "was the primary marksmanship

instructor and the armorer at the facility" and "trained with the M-14

there."  He was also "associated with the M-14" at the Quantico gunsmith

facility (*Id.* at 13) and "was assigned to implement the M-14 at the

Columbian [South America] Marine Corps" where he "set up an armorer's

training academy and trained the Columbian Marine Corps, trained their

instructors on how to train with the M-14, repair and shoot the M-14 .

. . ."  In addition to his activities in the Marine Corps, Vasquez "sold

and built match-grade M-14's for competitive shooters."  *Id.* at 13.  He

has worked on "thousands" of M-14's over the years.  *Id.* at 13.

<u>Argument</u>

A)  In footnote 1 of the Government's Memorandum, the Government asserts that the purported facts that "all of the defendant receivers were remanufactured . . . from halves of M-14 military machineguns that Kelly welded together into M—K Specialities receivers" are undisputed. As these purported facts are not based on any source set forth in Rule 56(c), Fed.R.Civ.Pro., they may not be considered by the court and, in any event, they are disputed.

> Rule 56(c), Fed.R.Civ.Pro., provides in part:
>
> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> *Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986) held:
>
> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

477 U.S. at 323.

As the statements in footnote 1 of the Memorandum are not based upon a "pleading," a "deposition," an "answer[] to interrogatories," an "admission[] on file", or an "affidavit" so as to be a proper basis of the motion, this court must deny summary judgment to the Government to the extent its motion is based upon those statements.

Further, even if the statements in footnote 1 of the Memorandum were based upon one of the documents enumerated in Rule 56(c), the facts stated therein are disputed.

The Kelly Affidavit states that the defendant receivers were
"manufactured" (not remanufactured) and that the process involved more
than just welding together halves of M-14 military machineguns.   In
pertinent part, the manufacturing process was as follows: First, a total
of approximately 3/8" to 7/16" additional metal was removed from each
of the two (2) sections by torch-cutting from the left side of the
receiver ends.  *Id.* at ¶ 7.  Next, the selector stud was removed from
the rear section by grinding (*Id.* at ¶ 8); the front and rear sections
were then placed on a weld fixture to ensure the precise length of the
newly manufactured receiver.  *Id.* at ¶ 9.  About 1/2" to 5/8" of weld
build-up using 8620 filler was added to the cut ends of the rear and
front sections to restore the missing metal; the sections were then
welded together with an approximate root opening of 1/4" to 3/8".  *Id.*
After welding, the joined sections were machined and heat-treated (*Id.*
at ¶ 10); a dummy, non-functional selector shaft and lock, and the upper
portion of a sear release (which would be visible on the exterior of an
M-14 machinegun receiver), were then welded onto the completed receiver.
*Id.* at ¶ 14.  Any excessive metal on the interior side of the completed
receiver was removed by grinding.  *Id.*

   B) The meaning of "restored": The Government assets that

   the term "restored" refers to any firearm that was once
   capable of firing automatically, such as a (sic) M-14
   military machine gun that has been modified to prevent
   automatic firing, which can be remodified to again fire
   automatically.

Memorandum at 2.

It is a "fundamental canon of statutory construction" that, "unless
otherwise defined, words will be interpreted as taking their ordinary,

contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42 (1979).  The word "restored" is not defined by the statute; thus, it must be given its ordinary, contemporary, common meaning.  As the court in *United States* v. *Seven Miscellaneous Firearms*, 503 F.Supp. 565 (1980) noted, "'restorable' is defined by Webster 'to bring back to a former or normal condition, as by repairing, rebuilding, altering, as to restore a building, painting, etc."  503 F.Supp. at 574.  Accordingly, the term "restored" means that an object was previously in a particular condition and has been returned to that previous condition.[2]  The defendant receivers were not returned to a previous condition as they were not M-14 receivers which had been "modified"; rather, they were new creations because they were manufactured from pieces of two different receivers ("Each M-14A receiver was manufactured from a rear section and a front section of two (2) different M-14 receivers")(Kelly Affidavit at ¶ 7) from which the selector stud had been removed.  *Id.* at ¶ 8.  The defendant receivers were, therefore, manufactured into a new, and previously nonexisting, condition and were not "restored" because the process was not returning them to a previous condition, but manufacturing them into a new condition.

Indeed, the Government implicitly recognizes that the defendant receivers were not "restored" when it (correctly, and more accurately) states that the defendant receivers "can be <u>converted</u> to fire

---

[2]  ATF Rul. 83-5 (Appendix 4 to Government's Memorandum) refers to weapons which "previously could shoot automatically but will not in their present condition." This interpretation of the statutory term is not adequate as it does not take account whether the weapon may be brought back to its previous condition; if a weapon previously could shoot automatically, but cannot be brought back to its previous condition, it is not restorable.

automatically" (Memorandum at 2, n.4)(emphasis added) and "ATF technician Richard Vasquez converted a typical M—K Specialities model M-14A receiver to fire automatically in under 50 minutes." Memorandum at 3 (emphasis added).[3]   Indeed, 26 U.S.C. § 5845(b) distinguishes between "restoration" and "conversion":

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun . . . . (emphasis added).

In sum, the undisputed evidence shows that the defendant receivers were not "restored" and thus could not be "readily restored" so as to fall within the definition of "machinegun" in § 5845(b).

C) The meaning of "readily": Even if the process necessary to convert the defendant receivers could be considered a "restoration," it could not be done "readily."

As noted previously, it is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin, supra, 444 U.S. at 42.  As the word "readily" is not defined, it must be given its ordinary, contemporary, common meaning.

The court in Seven Miscellaneous Firearms, supra, noted: "'Readily,' according to Webster, means: without hesitation; without delay; quickly; without difficulty."   503 F.Supp. at 573.   Thus,

---

[3]  The term "convert" means "to change from one form or use to another . . . ." Webster's New World College Dictionary.

"readily" has both a time dimension and a methodological dimension.[4]
The process utilized by ATF technician Vasquez to convert a defendant
receiver to the configuration of an M-14 receiver, involving
approximately 50 minutes of labor (which is not quickly) by a highly
trained and experienced gunsmith making alterations to the structure of
the receiver is not "readily" since the process is neither quick nor
without difficulty.

### 1. Legislative history of "readily restored"

While resort to legislative history is unnecessary given that the
phrase "readily restored" is unambiguous,[5] the legislative history
confirms the above construction of the phrase.  *Cf. Negonsott v.
Samuels,* 507 U.S. 99, 106 (1993)("Although we think resort to secondary
materials is unnecessary to decide this case, the legislative history

---

[4]  In what appears to be the only federal statutory definition of "readily,"
Congress defined "readily achievable" as "easily accomplishable and able to be
carried out without much difficulty or expense."  42 U.S.C. § 12181(9).  Thus,
Congress recognized that "readily" encompasses both the concept of time and
methodology.

[5]  If the phrase was ambiguous, the ambiguity would have to be resolved against
the Government.  See *Leocal v. Ashcroft,* 125 S.Ct. 377 (2004):

> Because we must interpret the statute consistently, whether we
> encounter its application in a criminal or noncriminal context, the
> rule of lenity applies.  *Cf. United States* v. *Thompson/Center Arms
> Co.,* 504 U.S. 505, 517-518 (1992) (plurality opinion) (applying the
> rule of lenity to a tax statute, in a civil setting, because the
> statute had criminal applications and thus had to be interpreted
> consistently with its criminal applications).

125 S.Ct. at 384, n.8.

*Thompson/Center Arms Co.* established the statutory construction paradigm
for interpreting a definition in § 5845 in the context of a civil proceeding:
First, the Court "appl[ied] the ordinary rules of statutory construction" and
then, finding that there was ambiguity, rather than deferring to the agency, did
exactly the opposite and applied the rule of lenity because, "although it is a
tax statute that we construe now in a civil setting, the NFA has criminal
applications . . . ."  504 U.S. at 517 (interpreting § 5845(a)(3)).

-10-

of the Kansas Act supports our construction").

The origin of the definition of "machinegun" is H.R. 9066, introduced in the 73rd Congress in 1934. The bill defined "machinegun" as "any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading." After hearings in April, 1934, the definition was revised to define "machinegun" as "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." This definition was enacted on June 26, 1934 as part of the National Firearms Act of 1934, Ch. 757, 48 Stat. 1236 (1934) ("NFA").

In March, 1965, the Johnson Administration proposed legislation to amend the NFA. Proposed Amendments to the National Firearms Act and the Federal Firearms Act: Hearings Before the Committee on Ways and Means, House of Representatives, 89th Cong., 1st Sess. 3 (1965). This legislation proposed several amendments to the definition of "machinegun" in § 5848, then the definitions section of the NFA (now § 5845). Those amendments proposed to add to "any weapon which shoots, or is designed to shoot" the words "or which can readily be restored to shoot" and to add "the frame or receiver of any such weapon" and "any combination of parts designed and intended for use in converting a weapon . . . into a machinegun". *Id.* at 7. The addition of the "readily be restored to shoot" language was explained by the Administration as "merely a clarification of the law and represents the administrative construction of existing law." *Id.* at 4. During the hearings on the proposed legislation, Sheldon S. Cohen, Commissioner of

-11-

Internal Revenue, gave as an example machineguns which "were deactivated in such a way that simple insertion of a paper clip and removing a certain piece would make them usable again." *Id.* at 47.   The Johnson Administration's legislation was not enacted by the 89th Congress.

In the 90th Congress, Senator Hruska, on May 24, 1967, introduced S. 1854 to amend the NFA.   114 Cong. Rec. 13705.   Senator Hruska stated that S. 1854 "is similar in approach to S. 1591," the bill introduced for the Johnson Administration in the 89th Congress.   114 Cong. Rec. 13705.   The definition of "machinegun" was to be amended as proposed by the Johnson Administration in 1965.   The bill was referred to the Senate Judiciary and Finance Committees.   114 Cong. Rec. 13706.   The language was:

> intended to represent the administrative construction of existing law and to clarify a situation resulting from conflicting judicial decisions concerning the status of firearms which are disassembled or which are complete and operable except for a readily restorable part or parts.

Letter of July 6, 1967 from Fred B. Smith, General Counsel of the Treasury, to Hon. James O. Eastland, Chairman, Senate Judiciary Committee.   Hearings before the Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary, United States Senate, 90th Cong., 1st Sess., on S.1, S. 1853, and S. 1854 at 1087.[6]

The "conflicting judicial decisions" were *United States* v. *Thompson*, 202 F.Supp. 503 (N.D. Cal. 1962) and *United States* v. *Cosey*, 244 F.Supp. 100 (E.D. La. 1965).   In *Thompson*, the court held that a shotgun without a firing pin was not a "firearm" within the meaning of the statutory definition.   *Cosey*, however, held that a shotgun without a firing pin was a "firearm" since a Government witness "demonstrated

---

[6]  S. 1854 proposed to "modify the Act's definitions of machine gun, rifle, and shotgun."   *Id.*

-12-

to the court that he could arm the shotgun in a mere matter of seconds by inserting a nail for the firing pin."  244 F.Supp. at 102.

On April 29, 1968, the Senate Judiciary Committee reported out S.917, the Omnibus Crime Control and Safe Streets Act of 1967 (Title IV of which was a bill to amend the Federal Firearms Act of 1938); S.917 did not include any amendments to the NFA.[7]  S. Rep. 1097, 90th Cong., 2d Sess. (1968).  As part of a proposed substitute for the text of S.917 as approved by the Committee, Senators Dirksen, Hruska, Thurmond, and Burdick proposed Amendment 708, which would amend both the Federal Firearms Act and the NFA.[8]  The amendments to the NFA included the phrase "or which can be readily restored to shoot"; Senators Dirksen, Hruska, Thurmond, and Burdick explained that "readily restored to shoot" was:

> intended to mean that only a simple mechanical operation is required to restore a weapon to a capacity of fully automatic fire.

S.Rep. 1097 at 280.[9]

During floor debate on May 14, 1968, Senator Hruska offered Amendment 708.  114 Cong. Rec. 13196.  The amendment was rejected by a vote of 37 to 45 (114 Cong. Rec. 13196) because of the amendments to the Federal Firearms Act; there was no debate on the "can be readily restored to shoot" language.  On May 24, 1968, S.917 passed the Senate;

---

[7]  S. 1854 was not reported out by the Senate Judiciary Committee.

[8]  S.Rep. 1097 was partially reprinted in the U.S. Code, Congressional and Administrative News (USCCAN), beginning at page 2112.  The USCCAN reprint did not, however, include the text of Amendment 708 (beginning at page 259 of S.Rep. 1097) or the Sectional Analysis of the Provisions of Amendment 708 (beginning at page 268 of S.Rep. 1097).

[9]  "It is the sponsors that we look to when the meaning of the statutory words is in doubt."  *Schwegmann Bros.* v. *Calvert Corp.*, 341 U.S. 384, 394-395 (1951).

the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 197 (1968)("OCCSSA"), was enacted on June 19, 1968, Title IV of which amended the Federal Firearms Act; there were no amendments to the NFA.

On June 12, 1968, Senator Dodd introduced S.3633, a series of amendments to the OCCSSA.  114 Cong. Rec. 16883.[10]  The bill was referred to the Senate Judiciary Committee, which reported it out on September 6, 1968, with proposed amendments.  S. Rep. 1501, 90th Cong., 2d Sess. (1968).  The proposed amendments included the amendments to the NFA proposed by Senators Dirksen, Hruska, Thurmond, and Burdick as Title II of the bill, including the amendments to the definition of "machinegun." The Committee also proposed expanding upon S. 1854's amendments to the definition of "machinegun" by deleting "or semiautomatically" and adding:

> the frame or receiver of any such weapon, any combination of
> parts designed and intended for use in converting a weapon
> into a machine gun, and any combination of parts from which
> a machine gun can be assembled if such parts are in the
> possession of or under the control of a person.

S.Rep. 1501 at 73.

As proposed by the Committee, the pertinent part of the definition of "machine gun" would read:

> any weapon which shoots, is designed to shoot, or can be
> readily restored to shoot, automatically more than one shot,
> without manual reloading, by a single function of the
> trigger.  The term shall also include the frame or receiver
> of any such weapon, any combination of parts designed and
> intended for use in converting a weapon into a machine gun,
> and any combination of parts from which a machine gun can be
> assembled if such parts are in the possession of or under the

---

[10]  S. 3633 was the companion bill to H.R. 17735, which had been introduced in the House of Representatives on June 10, 1968.  As introduced, both bills proposed amendments to Title IV of the OCCSSA.

control of a person.

S.Rep. 1501, 90th Cong., 2d Sess. 73.

The Committee also proposed adding a definition of the term "unserviceable firearm" to mean "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition." S.Rep. 1501 at 75.

During the floor debate on September 17, 1968, Senator Hruska offered a bloc of the Committee's proposed amendments, which included the definition of "machine gun" and the definition of "unserviceable firearm." 114 Cong. Rec. 27136 (1968). He explained that these Committee amendments were "not disputed nor controverted." *Id.* These Committee amendments were adopted by the Senate by unanimous consent, without debate. *Id.* The Senate then passed S.3633 on September 18, 1968, 114 Cong. 27491, and substituted, in H.R. 17735, the language of S. 3633 for the language of H.R. 17735 which had earlier passed the House. *Id.*

When the amended version of H.R. 17735 was returned to the House, the House rejected the Senate amendments and a conference committee was appointed to resolve the differences. With regard to Title II of the bill, the conference committee recommended that the House adopt the Senate amendments. 114 Cong. Rec. 30578 (1968). The Senate and the House passed the conference committee's proposed bill on October 9 and 10 respectively. The President signed it into law on October 22, 1968. Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213 (1968).

From the legislative history, it is irrefutable that the purpose of the "readily restored" language was to encompass such actions as

-15-

"simple insertion of a paper clip" or "inserting a nail for the firing pin" in "a mere matter of seconds" or "a simple mechanical operation"; Congress did not intend that actions which required almost an hour of labor by a highly trained and experienced gunsmith using a well-equipped government facility was to be considered "readily."  Had Congress intended that general restorability was sufficient, the word "readily" would not have been enacted.  As Congress chose to limit restorability to weapons which could be *readily* restored, the court must honor that choice.

### 2. Case Law

The Government cites, *inter alia*, *United States v. Smith*, 477 F.2d 399 (8th Cir. 1973) with respect to the meaning of the term "readily." (Memorandum at 4).  *Smith* should not be followed by this court because its conclusion is contrary to the plain language of the statute and the legislative history as discussed, *supra*, and because it is contrary to the record in the case.

In *Smith*, the court affirmed Smith's conviction "after a trial to the court" in which the district court had found that to restore a machinegun in which the barrel was "'welded closed at the breech and was also welded to the receiver on the outside under the handguard'" would "'take about an 8-hour day in a properly equipped machine shop.'"  477 F.2d at 400.  After concluding that there was "'substantial evidence'" in the record "'to support the fact determination by the trial court,'" the Eighth Circuit held simply, without any analysis of the statutory language or review of legislative history, that the "trial court correctly determined that the machinegun in this case could be readily

-16-

restored to shoot automatically . . . ."  477 F.2d at 400-01.

The record reflects, however, that, at trial, the Government's expert was asked by the district court: "And it can't readily be fired - transferred to a firearm, can it?"  *Smith* Appendix at 55 (attached hereto as Exhibit D).  The Government's expert responded: "Made into a firearm, no, sir. It would take some time."  *Id*.  Thus, "the Government proceeded on the theory that, even if the gun was not readily restorable, it had to be registered as an unserviceable firearm . . . ."  *Smith* Petition for Rehearing at 2 (attached hereto as Exhibit E). As a result, in his opening brief on appeal, Smith did not argue that the purported machinegun was not readily restorable.  *Smith* Brief 10-15 (attached hereto as Exhibit F).  In its answering brief, however, the Government "shifted positions and claimed that the gun was readily restorable within the meaning of the Act."  *Smith* Petition for Rehearing at 3 (Exhibit E).  As Smith's counsel did not file a reply brief, the issue was never subjected to the adversarial process which allows a court to consider opposing views; only the Government's view was heard. *Smith* is thus not reliable authority.

More recently, *United States v. Aguilar-Espinosa,* 57 F.Supp.2d 1359 (M.D. Fla. 1999) discussed the meaning of "readily restored":

> a less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers, including, for example, Allen wrenches, files, jeweler's screw drivers, and the like but excluding, for example, the resources available to a master machinist with a modern and well-equipped lathe.

57 F.Supp.2d at 1362.

-17-

Case 1:04-cv-00041-IMK   Document 40   Filed 06/08/05   Page 18 of 26   PageID #: 157

In light of this holding, *Aguilar-Espinosa* rightly criticized *Smith*, *supra*, as "press[ing] the notion of 'ready restoration' near or beyond its distal boundary.  The applicable test is the 'readiness' of the restoration rather than its ultimate feasibility."  *Id.*

If the standard of *Aguilar-Espinosa* is applied to the case at bar, the defendant receivers cannot be "readily restored" as the (conversion) process involved more than an "assembly of manageable and available parts," *i.e.*, prior to the assembly of parts, a new selector stud (onto which the selector shaft and other parts could be mounted) had to be created by grinding.  It also required the skills of a highly trained and experienced gunsmith using not simple hand tools such as "Allen wrenches, files, jeweler's screw drivers," but and electrical grinder.

The Government also cites to *United States v. One Harrington and Richardson Rifle*, 378 F.3d 533 (6th Cir. 2004)[11], which this court should not follow as it did not apply the applicable standard of judicial review of an agency interpretation of a criminal statute.[12]  Notably, despite the holding of *One Harrington and Richardson Rifle*, the Government in the case at bar does not contend (as it properly cannot, but as it did in *One Harrington and Richardson Rifle*) that this court

---

[11]  The district court decision was reported at 278 F.Supp.2d 888 (W.D.Mich. 2003).

[12]  The appeal in *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F.Supp.2d 896 (E.D.Ky. 2003) is pending in the Sixth Circuit (No. 04-5082) and may result in modification of the decision in *One Harrington and Richardson Rifle*, *supra*, as *One Harrington and Richardson Rifle* was decided prior to the Supreme Court's decision in *Leocal v. Ashcroft*, 125 S.Ct. 377 (2004) which, for the reasons described below, invalidates the reasoning of *One Harrington and Richardson Rifle*.  The appeal in *United States v. One TRW U.S. Rifle, Model 14, 7.62x51 mm caliber, S/N 593006* (D.Az. 2004)(unpublished)(reproduced in Appendix 2) is pending in the Ninth Circuit (No. 04-16049).

-18-

should defer to its interpretation of 26 U.S.C. § 5845(b).

In *One Harrington and Richardson Rifle*, the court applied the analysis discussed in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944):

> [E]ven if the rifle's capacity to fire in full-automatic mode was destroyed as Berney maintains, that does not refute the ATF's finding that the rifle qualified as a machine gun because it retained features specific to the M-14 and could have been readily restored to fire automatically. The ATF's analysis was thorough, its reasoning was valid, and its decision was consistent with earlier pronouncements. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

378 F.3d at 534.

The panel in *One Harrington and Richardson Rifle*, however, applied an erroneous legal standard in applying a *Skidmore* analysis.

In *Skidmore*, the issue before the Court was whether "stay[ing] in the fire hall on the company premises, or within hailing distance, three and a half to four nights a week" (323 U.S. at 135) constituted working time for which overtime compensation was due under the Fair Labor Standards Act, a civil statute.  The Court stated: "[W]e hold that no principle of law found either in the statute or in Court decision precludes waiting time from also being working time."  323 U.S. at 136.  Thus, the statute was ambiguous as to the issue before the Court.  The Court noted that the Administrator had filed a brief *amicus curiae* asserting that "the general tests which he has suggested point to the exclusion of sleeping and eating time of these employees from the workweek and the inclusion of all other on-call time . . . ."  323 U.S. at 139.   In determining what weight to give the Administrator's interpretation of the Act in light the Act's ambiguity, the Court observed that "[t]here is no statutory provision as to what, if any, deference courts should pay to the Administrator's conclusions."  323

-19-

U.S. at 139.[13]  Thus, *Skidmore* is a case dealing with the degree to which
a court may defer to an administrative agency's interpretation of an
ambiguous civil statute which the agency administers.

Subsequent to the decision in *One Harrington and Richardson Rifle*,
the Supreme Court decided *Leocal v. Ashcroft*, 125 S.Ct. 377 (2004), in
which it unanimously adopted the plurality opinion in *United States* v.
*Thompson/Center Arms Co.*, 504 U.S. 505 (1992):

> Because we must interpret the statute consistently, whether
> we encounter its application in a criminal or noncriminal
> context, the rule of lenity applies.  *Cf. United States* v.
> *Thompson/Center Arms Co.*, 504 U.S. 505, 517-518 (1992)
> (plurality opinion) (applying the rule of lenity to a tax
> statute, in a civil setting, because the statute had criminal
> applications and thus had to be interpreted consistently with
> its criminal applications).

125 S.Ct. at 384, n.8.

The plurality opinion in *Thompson/Center Arms Co.* established the
statutory construction paradigm for interpreting a definition in § 5845
in the context of a civil proceeding: First, the Court "appl[ied] the
ordinary rules of statutory construction" and then, finding that there
was ambiguity, rather than deferring to the agency, did exactly the
opposite and applied the rule of lenity because, "although it is a tax
statute that we construe now in a civil setting, the NFA has criminal

---

[13]  The Court held that it would only "consider that the rulings, interpretations
and opinions of the Administrator under this Act, while not controlling upon the
courts by reason of their authority, do constitute a body of experience and
informed judgment to which courts and litigants may properly resort for guidance.
The weight of such a judgement in particular case will depend upon the
thoroughness evident in its consideration, the validity of its reasoning, its
consistency with earlier and later pronouncements, and all those factors which
give it power to persuade, if lacking power to control."  323 U.S. at 140.

applications . . . ."  504 U.S. at 517 (interpreting § 5845(a)(3)).[14]

Further, *One Harrington and Richardson Rifle* was not consistent with then existing Supreme Court case law, including *Skidmore*, in that *One Harrington and Richardson Rifle* did not conclude that § 5845(b) was ambiguous and, because *Skidmore* relates to deference to an agency's interpretation of an <u>ambiguous</u> <u>civil</u> statute, *Skidmore*'s reasoning had no bearing whatever on the case at bar and deference was unjustified.[15]

In addition, the instant proceeding is a forfeiture proceeding, which "is quasi-criminal in character." *Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700 (1965).  Moreover, forfeiture statutes are "not favored" and "should be enforced only when within both letter and spirit of the law." *United States* v. *One 1936 Model Ford V-8,* 307 U.S. 219, 226 (1939).  As it is a "well-established principle that penal statutes are to be construed strictly" (*F. C. C. v. American Broadcasting Co.,* 347 U.S. 284, 296 (1954)), the term "readily restored" must be construed strictly.

Thus, a district court may not defer to the agency's interpretation of § 5845(b); rather, the district court must "apply the ordinary rules

---

[14]  See also *Crandon v. United States,* 494 U.S. 152, 177 (1990)(Scalia, J. concurring)(administrative interpretation of a criminal statute "is not an administrative interpretation that is entitled to deference" as a criminal statute "is not administered by any agency but by the courts").  In *Stenberg v. Carhart,* 530 U.S. 914, 941 (2000), the Court adopted Justice Scalia's concurrence.

[15]  See also *Bowen* v. *Georgetown University Hospital,* 488 U.S. 204, 208 (1988)("precondition to deference under *Chevron* is a congressional delegation of administrative authority").  There is nothing whatever in § 5845(b) which indicates a congressional delegation of authority to the ATF to promulgate regulations establishing definitions of "machinegun"; indeed, the fact that § 5845(b) provides multiple, detailed definitions of "machinegun" indicates that Congress did not intend to delegate any authority to the ATF to promulgate regulations establishing definitions.

of statutory construction" (*Thompson/Center Arms Co.*, *supra*, at 518) and interpret and apply the law itself as the judiciary is:

> the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. (Citations omitted).   If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843, n.9 (1984).

The Government also mentions *United States v. Cantanzaro*, 368 F.Supp. 450 (D. Conn. 1973).   In *Cantanzaro*, the Government expert simply replaced "missing and broken parts" (which cost "less than $15" and were available from the manufacturer) on a short-barreled shotgun (368 F.Supp. at 451) (which did not restore it to automatic fire capability as stated in the Government's Memorandum at 4) in "approximately one hour." 368 F.Supp. at 452-53. By contrast, in the case at bar, far more than assembly of easily available and inexpensive parts is involved.

D. <u>The constitutionality of the phrase "can be"</u>: A weapon may be a machinegun if it "can be" readily restored.   The statute does not, however, specify by whom the weapon must be restorable, *i.e.*, a highly trained and experienced gunsmith with specialized equipment or a person of average intelligence with little or no special training or equipment.[16]

---

[16] *Cf. United States v. Whalen*, 337 F.Supp. 1012 (S.D.N.Y. 1972) in which the court suggested that standard must be the person of average intelligence with little or no special training or equipment:

> At trial the Government will be obliged to prove, not only that its experts, working with all the Government's resources, were able to

-22-

In *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998), the court found that an ordinance which included the phrase "may be restored" was "unconstitutionally vague . . . inasmuch as the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited." 152 F.3d at 537. The basis for the court's holding was that the ordinance did not indicate whether "may be restored" referred to "such as may be restored by the person in possession, or may be restored by a master gunsmith using the facilities of a fully-equipped machine shop." *Id.* (internal quotations omitted).

The phrase "can be" in § 5845(b) is equally unconstitutionally vague. Accordingly, this court cannot enforce the instant forfeiture.

E. The defendant receivers are not "designed" to shoot automatically: The Government asserts that the "designed" to shoot element of the definition of "machinegun" is "an independent basis for summary judgment" because four district courts have so held. Memorandum at 2, n.3. Unlike those cases, there is nothing in the record in the case at bar which supports that assertion because there is nothing in the record describing the design features of the defendant receivers.[17]

For example, in *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F.Supp.2d 896 (E.D.Ky. 2003), the Government had submitted a report prepared by the Firearms Technical Branch (FTB Report) which stated,

---

repair the guns, but also that defendant himself would have been able to have the weapons "readily restored to a firing condition."

337 F.Supp. at 1018.

[17] ATF Ruling 83-5 (Appendix 4) states that the "designed" refers to weapons which "possess specific machine gun design features which facilitate automatic fire by simple alteration or elimination of existing component parts."

-23-

*inter alia*, that the receiver retained the following design features specific to an M-14 machinegun:

> 1. At the right rear of the M-14 machinegun receiver is a portion referred to as the selector stud. The selector stud allows the sear release, the selector, the selector shaft, a spring pin, and a selector spring to be attached to the receiver.
>
> 2. A slot on the right side of the receiver rail that corresponds to a protrusion on the connector assembly.
>
> 3. Connector grove on the forward right side of the receiver rail that holds the front of the connector assembly against the side of the receiver.

Further, the FTB Report explained, the purpose of the "selector stud" was to "allow the sear release, the selector, the selector shaft, a spring pin, and a selector spring to be attached to the receiver." *Id.* If the sear release, the selector, the selector shaft, a spring pin, and a selector spring could not be attached, the FTB Report makes clear, the defendant receiver could not shoot automatically:

> An M-14 rifle has specific features that allow it to shoot automatically. Those features include:
>
> 1. Connector assembly, which operates to allow the firearm to shoot automatically;
> 2. The sear release;
> 3. The selector, which turns to allow the user to move a switch to select semiautomatic or automatic fire;
> 4. The selector shaft, which serves as a pivot point for the sear release;
> 5. A spring pin, which holds the selector to the selector shaft; and
> 6. A selector spring, which places tension on the selector.

*Id.*

There is no such report here setting forth what the Government believes to be the pertinent design features; thus, summary judgment may not be granted on the basis of the "designed to shoot" element of § 5845(b).

-24-

<u>CONCLUSION</u>

The court should deny the Government's motion for summary judgment and grant summary judgment to Claimants.

Respectfully submitted,

MICHAEL J. KELLY, SR.
WILLIAM THOMAS
GARY BEACH
By counsel

Richard E. Gardiner
Suite 404
10560 Main Street
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)

James Zimarowski /REG
James Zimarowski
265 High Street, Suite 200
Morgantown, WV 26505
(304) 292-7492
(304) 292-7496 (fax)

-25-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing CLAIMANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CLAIMANTS' CROSS-MOTION FOR SUMMARY JUDGMENT was mailed, first class postage prepaid, to Michael Stein, Assistant United States Attorney, 1100 Main Street, P.O. Box 591, Wheeling, WV 26003-0011 this 7th day of June, 2005.

Richard E. Gardiner